# STATE OF MICHIGAN

# COURT OF APPEALS

EDEN FOODS, INC.,

        Plaintiff/Counter defendant-
        Appellee,

v

AMERICAN SOY PRODUCTS, INC.,

        Defendant/Counter plaintiff-
        Appellant.

UNPUBLISHED
January 22, 2015

No. 318337
Washtenaw Circuit Court
LC No. 12-001219-CK

Before: MURRAY, P.J., and SAAD and K. F. KELLY, JJ.

PER CURIAM.

In this breach of contract action, defendant/counter plaintiff, American Soy Products, Inc (ASP), appeals by leave granted[1] an order denying its motion for summary disposition, dismissing its counterclaims and granting summary disposition in favor of Eden Foods, Inc. (Eden). Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

ASP was formed in 1985 pursuant to a Joint Venture Agreement (JVA) by and among Eden and four Japanese companies for the express purpose of providing Eden a unique brand of soymilk called Edensoy. Under the agreement, Eden was to be the sole sales agent of "Products A" in the United States and Canada. The parties acted in accordance with the JVA for 12 years until February 5, 1997, when they entered into the Amended and Restated Joint Venture Agreement (AJV).

The purpose of the AJV was to "broaden the business purpose of [ASP] to extend to the manufacture and sale of products other than soybean milk and related products" and to "restate the Joint Venture Agreement in its entirety to reflect the current understanding of the parties as to the future operation and management of [ASP]." Once again, Eden was appointed sole sales

---

[1] *Eden Foods Inc v American Soy Products Inc*, unpublished order of the Court of Appeals, entered October 30, 2013 (Docket No. 318337).

agent of Products A in the United States and Canada. Two months later, on April 9, 1997, ASP and Eden entered into a Sole Sales Agency and Requirements Agreement (SSARA), which provided that "[ASP] and Eden are entering into this Agreement in accordance with Article 22 of the New JV Agreement and in order to confirm, clarify and define the business relationship between the parties for the term hereof." Regarding the length of the SSARA's term, section 10.1 provided that "Subject to Paragraphs 10.2 and 10.3 below, this Agreement shall be effective as of the date hereof and shall expire ten years after the Phase 1 Full Commercial Production Date (the "Initial term"). The latter date was September 26, 1998, which made the expiration date for the SSARA September 26, 2008. There were a variety of ways that the SSARA could be renewed. For purposes of this appeal, section 10.2(d) provided that the agreement was renewable only by mutual agreement if sales of Products A are less than 60% of the Eden Allocation during the last five years of the initial term, or of any renewal term.

According to ASP, because market prices had gone up over the years and Eden had reduced its sales volume, the price at which it had been selling the product to Eden was "financially impracticable," yet Eden refused to discuss any price adjustments. At ASP's annual shareholders and board of directors meeting in January of 2008, at which Eden's president Michael Potter was present, Hiroyasu Iwatsuki, ASP's CEO and a member of ASP's board of directors, told the board that the SSARA (referenced in the meeting minutes as "Eden Foods Minimum Purchase Agreement") expired at the end of September 2008. On April 11, 2008, Iwatsuki sent Potter a letter:

> The Sole Sales Agency and Requirement Agreement (the "Agreement") dated April 9, 1997 between American Soy Products, Inc. ("ASP") and Eden Foods, Inc. ("Eden") is approaching the end of the term, i.e., September 26, 2008 as discussed from time to time at the board meetings of ASP. This letter serves as notice of expiration of the Agreement.

> ASP has made substantial investments in the manufacturing facilities. ASP also has experienced a severe market environment facing soymilk and soymilk related products ("product-A") during these years. We know ASP must gather every wisdom together to tide over the current difficult position. We should need the flexible and more diversified operation policy and strategy including production policy, marketing policy, terms of deals with customers, minimum purchase requirement, etc. We should review the basic terms and conditions of the Joint Venture Agreement dated February 5, 1997 rather than side issues.

> In this circumstance, if Eden desires to maintain a continuous business arrangement with ASP on Product A, we would like to discuss terms and conditions of a new agreement with you in detail. Once the new agreement is reached we will make every effort to obtain the approval therefor [sic] from the board of ASP prior to the end of the term of the Agreement.

On that same date, Potter signed the letter acknowledging that he had received it.

The notes from ASP's subsequent September 2008 Special Board of Directors Meeting indicate:

> Mr. Iwatsuki stated that he mentioned in previous board of directors meetings, the Sole Sales Agency and Requirement Agreement made and entered into on April 9, 1997 expires on September 26, 2008 and ASP does not intend to renew the agreement but want [sic] to have some agreement such as simply a supply agreement with Eden because Eden Foods is a partner of this joint venture company and one of the most important customers for ASP. He stated that he wants to study about this together with Eden by next board of directors meeting.

> Mr. Mike Potter, Chairman & President of Eden Foods, Inc., stated that the business circumstances now have changed much from that of the time at the existing agreement was made 10 years ago. He agreed with Mr. Iwatsuki's idea and stated that the new agreement should be simple and want to make it meet the current business circumstances. The board agreed.

Nonetheless, ASP continued producing and providing Edensoy to Eden for several more years.

This lawsuit began when ASP allegedly delivered defective goods—leaking containers—to Eden in October 2012, prompting Eden to withhold payment to ASP on open invoices pending quantification of the damages caused by ASP's breach. ASP then terminated supply to Eden, asserting that it was under no obligation to supply Eden with soymilk.

On November 14, 2012, Eden filed suit, seeking injunctive relief and specific performance. Eden alleged a breach of contract, and specifically referred to the contract as the SSARA agreement. Eden asked the court for a temporary restraining order requiring ASP to continue producing Edensoy and providing it to Eden. ASP argued that the SSARA had expired and, therefore, there was no obligation on its part to sell soymilk to Eden. The trial court entered the preliminary injunction for the pendency of the suit and ordered that "the parties continue to perform in accordance with past practice, with forecasts, production schedules, purchase orders, invoices, and payments." On ASP's application for leave to appeal the injunction, this Court vacated the trial court's order in lieu of granting the application because Eden failed to establish irreparable harm. *Eden Foods, Inc v American Soy Products, Inc*, unpublished order of the Court of Appeals, entered May 2, 2013 (Docket No. 314730).[2]

Meanwhile, ASP filed counterclaims against Eden. ASP alleged that: (1) Eden failed to pay for the soymilk that ASP had provided; (2) Eden breached a March 1, 2012 settlement agreement by failing to implement a plan for promoting the product; (3) Eden breached a 2009 settlement agreement by setting off amounts to ASP; (4) Eden breached an agreement it had with ASP wherein both parties agreed to each pay a portion of the legal fees associated with a 2012

---

[2] Our Supreme Court denied leave to appeal on September 6, 2013. *Eden Foods, Inc v Am Soy Products, Inc*, 495 Mich 856; 836 NW2d 174 (2013).

loan; and (5) Eden breached an oral agreement with ASP in which Eden agreed to pay for raw materials that ASP purchased for use in producing Edensoy.

Eden filed an amended complaint on January 2, 2013, specifically incorporating breaches of the parties' AJV.

The parties filed competing motions for summary disposition. Following a hearing, the trial court issued a written opinion and order granting Eden's motion for summary disposition and denying ASP's motion for summary disposition. In sum, the trial court ruled as follows:

- The [AJV] imposes an obligation upon ASP to supply Edensoy to Eden;

- The Sole Sales Agency and Requirements Agreement (SSAR[A]) is presently in effect;

- The [AJV] has a clear termination provision and is not a perpetual contract;

- The Eden Allocation is the amount of ASP's production capacity for all products that would be devoted to producing soymilk for Eden; and the supply relationship does not end if the Eden Allocation was not met;

- The escrowing of the money damages at issue ($177,000.00) was in compliance with the [AJV];

- ASP provided defective leaking cartons of Edensoy to Eden in September and October 2012 not in compliance with the [AJV] and SSAR[A];

- The Edensoy affected by the defective, leaking cartons is known to the parties and reflected in purchase orders, invoices, and credits;

- ASP stopped filling Eden's orders for Edensoy and ceasing production of Edensoy are breaches of its contracts with Eden;

- Eden has suffered damages as a result of ASP's breach of contract in an amount to be determined at trial.

ASP now appeals by leave granted.

## II. ANALYSIS

On appeal, ASP argues that the trial court erred in granting Eden summary disposition, denying ASP's motion for summary disposition, and dismissing ASP's counterclaims. We disagree.

Both a trial court's ruling on a motion for summary disposition as well as the proper interpretation of a contract are questions of law that are reviewed de novo on appeal. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003).

-4-

A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).]

Where, as here, there is no claim of ambiguity, the interpretation of a contract's provisions is purely a question of law. *Holmes v Holmes*, 281 Mich App 575, 587; 760 NW2d 300 (2008).

The original JVA provided that "The New Company [ASP] shall appoint EDEN to be the sole sales agent of the Products in the U.S.A. and Canada." Although the JVA indicated that the parties were going to enter into a contemporaneous sole sales agency agreement, the parties never executed one. In the absence of a sole sales agency agreement, the parties nevertheless acted in accordance with the exclusive sales provision of the JVA until it was amended and restated in a February 5, 1997 AJV. As previously stated, the purpose of the AJV was to "broaden the business purpose of [ASP] to extend to the manufacture and sale of products other than soy bean milk and related products" and to "*restate the Joint Venture Agreement in its entirety* to reflect the current understanding of the parties as to the future operation and management of [ASP]." (Emphasis added.) Thus, the AJV confirmed the parties' relationship and simply expanded ASP's business operations for products other than soy milk.

Under the AJV, ASP's stated business purpose consisted of manufacturing Products A (soybean milk and related products) as well as Products B (other beverages, including fruit juices and other foods not included in Products A). ASP was authorized to enter into "co-packing agreements" with other purchasers. However, under both the old and new joint venture agreements, Eden was the sole distributor and sole sales agent of ASP's soy milk and related products.

Under article 20 of the new agreement, ASP "shall appoint Eden to be the sole sales agent of Products A in the U.S.A. and Canada." Article 22 of the AJV further provides:

For the purpose of carrying out the project described in this Agreement, Eden agrees to do the following:

(a) Eden agrees to enter into and execute a "Sole Sales Agency Agreement" attached hereto as Exhibit G with the Company relative to the sale of Products A. Eden also agrees to purchase all its requirements of Product A for sale in the U.S.A. and Canada from [ASP] *through the term of the joint venture*, provided that (i) [ASP] is able to meet such requirements on an ongoing basis (or in case of shortage of capacity, develops and implements a mutually agreeable plan to provide such capacity) and (ii) the quality, price and terms of Products A manufactured by [ASP] continue to be competitive and consistent with the standards which have heretofore been established over the course of the joint venture.

-5-

(b) Eden agrees to render, within its means, a complete marketing service in connection with the sale of Products A in the U.S.A. and Canada. [Emphasis added.]

There is no dispute that the AJV is still in effect.

The trial court concluded that the original AJV "creates a supply and requirements relationship between Eden and ASP." The trial court found that the AJV created "an exclusive dealing contract that obligates ASP to use its best efforts to supply soymilk to Eden" as well as "use its best efforts to maintain the high quality standards of the products to be manufactured by ASP consistent with the high standards which have heretofore been established over the course of the joint venture." The trial court concluded that ASP delivering defective product and then subsequently refusing to supply Eden with soymilk constituted a breach of the AJV and that ASP's obligations were not relieved when the SSARA allegedly expired. Importantly, the trial court noted that "[t]he SSAR[A] does not purport to supersede the stated purpose of the [AJV], but only to confirm, clarify, and define the business relationship between the parties for the term hereof. The supply and requirements relationship is established in the [AJV], and the particulars of the relationship are implemented as set forth in the SSAR[A] during the term of the SSAR[A]." The trial court concluded that ASP was not relieved of its obligation to use its best efforts to supply Eden with its soymilk requirements under the AJV.

We agree. The AJV created a supply and requirements relationship between Eden and ASP. A requirements contract is one in which "the quantity term is not fixed at the time of contracting [and t]he parties agree that the quantity will be the buyer's needs or requirements of a specific commodity or service" over the life of the contract. Corbin, Contracts (rev ed), § 6.5, p 240. The terms of the AJV could not be more clear – Eden agreed to purchase its soy milk requirements from ASP and ASP, in turn, agreed to supply Eden with Eden's soy milk requirements. Under a requirements contract, the parties are expected to act in good faith and according to commercial standards of fair dealing in the trade. *Gen Motors Corp v Paramount Metal Products Co*, 90 F Supp 2d 861, 873 (ED Mich, 2000). A party may be subject to liability for breach of contract if it acts in bad faith or seeks to unilaterally terminate purchase orders. *Id.* "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." MCL 440.2306(2).

Contrary to ASP's assertions, the AJV is not so indefinite as to render it unenforceable. Comment 2 to MCL 440.2306 provides "[u]nder this Article, a contract for output or requirements is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party." Moreover, "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." MCL 440.2204(3).

Therefore, standing alone, the AJV created a contract between the parties and, by delivering defective goods and then refusing to supply Eden with its soy milk requirements, ASP clearly breached the AJV. Again, there is no dispute that the AJV remains in effect. ASP does not dispute that certain of its shipments were defective. Eden was, therefore, authorized to offset the purchase price pursuant to MCL 440.2717, which provides: "The buyer on notifying the

-6-

seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."

ASP argues that, in entering into the SSARA, the parties effectively "otherwise agreed" to modify the AJV, as contemplated under MCL 440.2306(2) and, therefore, only the SSARA, and not the AJV, was the only contract at issue. Given the relationship between the parties, this argument is disingenuous. After all, the parties have been acting in accordance with one form or another of a joint venture agreement since 1985, with or without a separate sole sales agreement. Additionally, the SSARA indicated that "[ASP] and Eden are entering into this Agreement in accordance with Article 22 of the New JV Agreement and in order to *confirm, clarify and define* the business relationship between the parties for the term hereof." There is absolutely no indication that the SSARA supersedes the AJV.

Moreover, although ASP claims that Eden's president, Michael Potter, admitted that the AJV did not require a supply of milk, the testimony to which ASP refers is incomplete. Potter testified that he never formally objected to Iwatsuki's letter or the board minutes regarding the expiration of the SSARA because "it was my assumption that the agreement was continuing beyond the dates associated with them." He testified that he believed ASP had a duty to make its best efforts to continue to supply Eden with its requirements. Therefore, contrary to ASP's contention, Potter's testimony does not support its position.

The trial court also properly rejected ASP's contention that the AJV was a "perpetual agreement" and, therefore, terminable at will. "[W]here the parties have not agreed upon the term, duration, or manner of termination of such an agreement it is generally deemed to be terminable at the will of either party because they have not agreed otherwise." *Lichnovsky v Ziebart Intern Corp*, 414 Mich 228, 240-41; 324 NW2d 732 (1982). This is true, not because "the word 'indefinitely' appears in the agreement or because the term or duration of such an agreement can properly be characterized as indefinite but because there is no agreement concerning term, duration, or manner of termination, and it is generally thought to be reasonable in such a case to infer that the parties intend that the agreement be terminable at the will of either party." *Id.* at 242. In contrast, "[a]n agreement which the parties have agreed is terminable only for cause, and which is thus by their agreement to endure until so terminated, is legally enforceable until terminated on that ground." *Id.* at 241. In that situation, "[a]lthough the agreement is, in one sense, 'indefinite' as to term or duration, it is not the kind of agreement with an 'indefinite term' subject to the rule of construction that such an agreement is terminable at will." *Id.* at 243. Article 10 of the AJV entitled "Important Matters" provides that "all resolutions relating to important matters as stipulated below shall be adopted by more than two-thirds of the votes of the shareholders present in order to be effective," including "[a]ny change of business purpose." Moreover, even if we were to conclude that the AJV was a perpetual contract, ASP never gave notice of its intention to terminate the AJV. At most, ASP advised that the SSARA had expired and it was seeking to redefine the parties' relationship with a new agreement. Pending that new agreement, however, ASP and Eden acted in a manner that was consistent with "business as usual."

In any event, it appears that the SSARA continued to be in effect. The trial court found that, contrary to ASP's suggestion, "Eden did not promise to purchase the Eden Allocation." In fact, the minimum quantities referenced in the SSARA were for *Eden's* protection. In the event

Eden's annual requirements were less than the allocation, ASP was free to reallocate its production capacity to other products. But the trial court concluded that "[n]o reasonable interpretation of the SSAR[A] supports a finding that the supply relationship would end if the Eden Allocation was not met. The provision expressly gives the right to reallocate only the portion of the Eden Allocation that is not needed by Eden." The trial court also looked to the fact that ASP continued to pay Eden a two percent commission under SSARA. That, in conjunction with the fact that ASP never alleged expiration of the agreement during the parties' earlier settlements in 2009 and 2012, made "ASP's actions since September 2008 . . .incongruent with its claims in this lawsuit." The trial court held:

> The only logical conclusion this Court can draw is that the parties renewed the SSAR[A] by mutual agreement by continuing to do "business as usual." Either the parties determined, through their course of dealing, to ignore the Eden Allocation provision, or the parties manifested their mutual assent to continue the SSAR[A]. Either way, as this Court explained at the Injunction hearing, "the agreement remains in full force and effect pursuant to the automatic renewal that was occurring between the parties."

The trial court's findings and conclusions are well founded. Regarding the length of the SSARA's term, section 10.1 provided that "Subject to Paragraphs 10.2 and 10.3 below, this Agreement shall be effective as of the date hereof and shall expire ten years after the Phase 1 Full Commercial Production Date (the "Initial term"). The latter date was September 26, 1998, which made the expiration date September 26, 2008. Section 10.2 of the SSARA dealt with renewals. Specifically:

> 10.2 <u>Renewals.</u>
>
> It is the mutual intention of the parties that Eden shall remain the sole sales agent and exclusive distributor of Products A indefinitely, unless Eden's sales and marketing efforts produce materially deficient sales of Products A. Accordingly, the following provisions are intended to provide assurances to Eden that its exclusive rights will continue, subject to satisfactory performance, and to provide assurances to [ASP] that the function of sales and marketing of Products A will be properly and successfully performed. All sales tests set forth below are based on product having been available to Eden substantially in accordance with agreed-upon production schedules pursuant to Section 6, and shall be adjusted if product unavailability is experienced.
>
> (a) In the event that during the last five years of the Initial Term, sales of Products A shall have averaged at least ninety (90%) percent of the Eden Allocation established in Section 2.2, then this Agreement shall automatically be renewed for an additional five-year term on the same terms and conditions including Eden's continuing to serve as exclusive distributor and sole sales agent. ("First Renewal Term").
>
> (b) In the event that during the entire First Renewal Term, sales of Products A shall have averaged at least ninety [percent] (90%) of the Eden

Allocation established in Section 2.2, then this Agreement shall automatically be renewed for an additional five-year term on the same terms and conditions including Eden's continuing to serve as exclusive distributor and sole sales agent ("Second Renewal Term"). As long as sales of Products A shall have averaged at least ninety (90%) percent of the Eden Allocation, the term of this agreement shall automatically renew for successive five- year periods on the same terms and conditions including Eden's continuing to serve as exclusive distributor and sole sales agent.

(c) In the event that during the last five years of the Initial Term, sales of Products A shall have averaged less than ninety percent (90%) but more than sixty percent (60%) of the Eden Allocation established in Section 2.2, then the term of this Agreement shall at Eden's option be renewed for an additional five-year period on the same terms and conditions, except that Eden's rights as exclusive distributor and sales agent shall be changed as follows:

The section sets forth a schedule reducing Eden's rights of exclusivity to ASP's production capacity in a manner correlating to the amount of shortfall of sales under 90 percent. Under section 10.2(d), the agreement was renewable only by mutual agreement if sales of Products A are less than 60% of the Eden Allocation during the last five years of the initial term, or of any renewal term. While the parties spend a great deal of time discussing the Eden Allocation and whether it was met over the years, it is clear that, through their behavior, the parties decided to disregard that requirement. That the parties intended that the SSARA continue is buttressed by the fact that ASP never raised the issue during the parties' 2009 and 2012 disputes. And, even more telling is the fact that ASP continued to pay Eden commissions. While the SSARA clearly contemplated that Eden would be the sole sales agent, article 7 of the SSARA provided that, in the event ASP sold Products A to "co-pack customers" that Eden would "be compensated on the basis of a mutually agreed commission of not less than two percent (2%) of [ASP's] net sales of Products A to that customer." Such behavior is inconsistent with non-renewal.

The trial court also properly dismissed ASP's counterclaims, which border on frivolous. At the hearing on the competing motions for summary disposition, ASP admitted that it shipped defective goods – "we acknowledge there was difficulty with these products and . . . I think we probably would acknowledge that there is a damage claim that needs to be addressed." As previously stated, Eden properly offset the cost of the defective goods under MCL 440.2717. And, contrary to ASP's contention, the parties' 2009 settlement agreement did not prohibit Eden from setting off costs for future defective products; the agreement only limited further deductions for the goods giving rise to the 2009 agreement.

None of ASP's remaining counterclaims are supported with documentary evidence. While ASP complains that Eden failed to promote its product, it set forth no evidence that a breach occurred. Nor was there a contract providing that Eden would pay a portion of the legal fees associated with a 2012 closing. While ASP's president claimed that the parties agreed during a board meeting that Eden would pay its own legal fees going forward, there was no mention of the agreement in the board's minutes or resolutions. The trial court found that "[m]ere discussions and negotiation cannot be a substitute for the formal requirements of a contract." Finally, no contract existed obligating Eden to pay for raw materials purchased by

ASP.  In its brief on appeal, ASP writes that "Eden has never offered a shred of actual evidence showing either (1) that the agreements did not exist, or (2) that Eden was free to ignore their terms."  However, ASP, as the one claiming the breach, has the burden of proof.  "A plaintiff's burden of proof encompasses two separate concepts: (1) the burden of persuasion, and (2) the burden of going forward with the evidence.  While the former does not shift during the course of a trial, the latter may shift to the opposing party." *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 175-76; 530 NW2d 772 (1995) (internal quotation marks and citations omitted).  However, "[t]he burden of persuasion never shifts during trial from the plaintiff to the defendant.  Only the burden of going forward may shift from one side to the other at various times during the trial as evidence is introduced by the respective parties." *Michigan Tractor & Mach Co v Elsey*, 216 Mich App 94, 102; 549 NW2d 27 (1996) (internal citation omitted).  ASP was required to show that a contract existed and that it was breached; Eden was not required to prove the nonexistence of said contracts.

Affirmed.  As the prevailing party, Eden may tax costs.  MCR 7.219.

/s/ Christopher M. Murray
/s/ Henry William Saad
/s/ Kirsten Frank Kelly