*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DILLON ENERGY SERVICES, INC.,

      Plaintiff/Counterdefendant-Appellee,

v

NEW PRODUCTS CORPORATION,

      Defendant/Counterplaintiff-Appellant.

UNPUBLISHED
March 26, 2025
1:06 PM

No. 368316
Berrien Circuit Court
LC No. 2021-000178-CB

Before: N. P. HOOD, P.J., and BOONSTRA and FEENEY, JJ.

PER CURIAM.

In this action arising out of a contract to supply natural gas, defendant/counterplaintiff, New Products Corporation (New Products), appeals by right the trial court's order awarding damages in favor of plaintiff/counterdefendant, Dillon Energy Services, Inc. (Dillon). On appeal, New Products argues that the trial court clearly erred by awarding damages in Dillon's favor for three reasons. First, New Products argues that Dillon failed to prove that it agreed to the price charged for natural gas during the timeframe at issue. Second, New Products argues that Dillon failed to prove that the price it charged for natural gas during the timeframe at issue was reasonable, as required under the Uniform Commercial Code, MCL 440.1101 *et seq*. And third, New Products argues that Dillon failed to prove its alleged contract damages with reasonable certainty. We disagree with each of New Products's arguments and affirm.

## I. BACKGROUND

New Products is an automotive supplier specializing in precision die casting that uses natural gas for its manufacturing operations. Dillon is a retail natural gas supplier that purchases natural gas from wholesale distributers and arranges for its delivery to customers through utility companies. In May 2015, the parties entered into a "Natural Gas Sales Agreement."[1] The

---

[1] The agreement stated that it would automatically renew for successive one-year terms unless terminated by either party. Either party could terminate the agreement by providing written notice of termination at least 30 days before the expiration of any term.

agreement, which designated New Products as the "Buyer" and Dillon as the "Seller," contained the following relevant provisions:

4. **Quantity:** Seller agrees to sell, and Buyer agrees to purchase the volume(s) of Gas set forth in an Exhibit . . . , via an e-mail, telephone conversation or other mutually agreed upon communications medium during the term of this agreement.

* * *

5. **Price:** During the term of this agreement Seller agrees to sell, and Buyer agrees to purchase the volume(s) of Gas at prices negotiated via an e-mail, telephone conversation or any other modes of communications ("Contract Price").

* * *

9. **Nominations:** Seller will nominate daily and/or monthly volumes to the [local utility] or Pipeline on behalf of the Buyer, in accordance with the attached Schedule B, ("Consulting Agreement"). Volumes nominated shall be based on prior usage history and current projected requirements. Seller shall nominate supplemental volumes if necessary to maintain adequate storage volumes and to prevent unauthorized usage penalties. During an Operational Flow Order (OFO)[2] . . . issued by a [local utility] or Pipeline, Buyer agrees to limit their Gas consumption to Seller's daily nominated quantity, and Seller agrees to use its best efforts to limit deliveries to Buyer[']s Gas consumption levels. Buyer shall be responsible for the cost of purchasing additional volumes of Gas and/or remarketing [excess] volumes resulting from the OFO.

* * *

11. **Billing and Payments:** Seller shall invoice the Buyer based on nominated volumes on approximately the 15th of the delivery month. Buyer agrees to pay Seller the sum shown by each billing, including sales, use, franchise and excise taxes and all other governmental impositions relative to the sale or consumption of Gas. Seller shall make payments by electronic funds transfer or other agreed upon method of payment on or before the 5th of the month following the delivery month unless otherwise agreed upon. Unpaid invoices when due shall be subject to a late interest charge at the rate of one and one half percent (1½%) per month. If Buyer fails to make payment on or before the due date Seller at its sole discretion and upon notice to Buyer, may terminate this Agreement and/or any . . . transaction under this Agreement and/or immediately suspend deliveries hereunder. In the event it becomes necessary to commence litigation to recover the amount

---

[2] Dillon's president testified that utility companies issue OFOs to influence the volume of natural gas their customers use in the event of supply excesses or shortages. While an OFO is in effect, utility companies penalize their customers for using too much or too little natural gas.

owed under this Agreement, the prevailing party shall be entitled to recover all attorney fees and related costs.

Dillon supplied natural gas to New Products and a pool of other customers by purchasing it from Twin Eagle Resource Management (Twin Eagle) and arranging for its delivery through Michigan Gas Utilities (MGU). Dillon gave New Products the option to obtain natural gas through the spot market,[3] hedging,[4] or some combination of both. In February 2021, New Products chose to purchase natural gas through the spot market.

That month, the price of natural gas substantially increased because of weather conditions, and on February 6, 2021, MGU issued an OFO. Between February 13, 2021 and February 17, 2021, natural gas prices spiked. On February 18, 2021, Dillon sent an e-mail to its customers advising them that "[d]ue to unprecedented cold weather . . . we are seeing many natural gas wells freezing and along with unseasonably cold weather in the mid-continent and upper great lakes we are anticipating [] uncommonly high Feb21 MGU Pool Prices." The e-mail stated that "[i]f you are able to decrease the amount of MGU Pool Gas needed it will lower your overall exposure for these anticipated higher prices."

On February 28, 2021, Dillon invoiced New Products $62,916.01 for its natural gas use in February 2021. The invoice reflected that New Products used 2,589 units of natural gas, which were purchased on the spot market at a rate of $24.19 per unit. It also accounted for a utility charge, a prior credit, and sales tax. New Products refused to pay the balance reflected on the invoice.

In August 2021, Dillon filed a complaint against New Products, alleging that it breached the parties' contract by refusing to pay the balance reflected on the February 2021 invoice. New Products answered Dillon's complaint and filed a counterclaim, alleging that Dillon breached the parties' agreement by failing to disclose material facts related to the price of natural gas it supplied in February 2021. Dillon moved for summary disposition of its complaint and New Products's counterclaim. In September 2022, the trial court granted summary disposition in Dillon's favor under MCR 2.116(C)(10).

In January 2023, the trial court held an evidentiary hearing regarding damages. Dillon's president was its sole witness. He explained how it calculated New Products's February 2021 invoice balance. He testified that Dillon multiplied the volume of natural gas MGU delivered to New Products by the average per-unit price of natural gas Dillon purchased on the spot market for its customer pool during the entire month. He stated that Dillon could not control the price of natural gas it purchased on the spot market, and each of Dillon's customers paid the same spot-market prices in February 2021. He also stated that New Products agreed to allow Dillon to

---

[3] The spot market refers to a market for the purchase of goods for immediate or near-term delivery. See *Black's Law Dictionary* (12th ed).

[4] Dillon's president testified that, in this context, hedging refers to a risk-management strategy under which its customers agree to purchase natural gas at a fixed price during a set period.

balance its natural gas usage as part of a customer pool, rather than on an individual basis, to mitigate the risk of incurring penalties from MGU for using greater or lesser volumes of natural gas than nominated. He stated that MGU and Twin Eagle kept track of New Products's natural gas use, Dillon logged that information in its computer system, and Dillon's computer system calculated the average spot market rate for natural gas. He also stated that Dillon's accountant used the data and calculations in its computer systems to generate New Products's February 2021 invoice. During the hearing, Dillon successfully moved to admit an S&P Global Platts publication regarding the average price of natural gas in regions throughout the United States between February 1, 2021 and February 26, 2021. The publication provided that the average per-unit price of natural gas in the upper Midwest spiked to $71.665 between February 13, 2021 and February 16, 2021. It fell to $53.620 on February 17, 2021, and ranged from $2.520 to $15.205 throughout the remainder of the listed dates. New Products's chief executive officer (CEO) then testified that the February 2021 invoice New Products received from Dillon was significantly greater than usual. She characterized it as an "extraordinarily large bill that was way out of whack from anything received before," and explained that New Products refused to pay it because "we didn't understand the charge."

In June 2023, the trial court issued a written opinion regarding its findings of fact and conclusions of law and entered a damages award in Dillon's favor. It awarded Dillon $80,759.29, which included "$62,916.01 for natural gas provided under the Agreement, and $17,843.28 in interest (at the contracted rate of 1.5%)." It also awarded Dillon $38,000 in attorney fees and costs per the parties' stipulation. This appeal followed.

## II. STANDARDS OF REVIEW

"As with other findings of fact, an award of damages is reviewed on appeal pursuant to the clearly erroneous standard." *Jackson v Bulk AG Innovations, LLC*, 342 Mich App 19, 24; 993 NW2d 11 (2022) (quotation marks and citation omitted). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 171; 530 NW2d 772 (1995). We further review de novo a trial court's legal conclusions. *In re Conservatorship of Brody*, 321 Mich App 332, 336; 909 NW2d 849 (2017).

## III. LAW AND ANALYSIS

On appeal, New Products argues that the trial court clearly erred by awarding damages in Dillon's favor because it failed to prove that New Products agreed to the price charged for natural gas during the timeframe at issue, it failed to prove that the price it charged for natural gas was reasonable under the Uniform Commercial Code, and it failed to prove its alleged damages with reasonable certainty. We disagree with each of New Products's arguments.

"In a breach-of-contract action, an injured party may seek damages for an injury caused by another party's breach of a contractual obligation." *Wright v Genesee Co*, 504 Mich 410, 419; 934 NW2d 805 (2019). An injured party may recover damages "that arise naturally from the breach or those that were in the contemplation of the parties at the time the contract was made." *Id*., quoting *Kewin v Mass Mut Life Ins Co*, 409 Mich 401, 414; 295 NW2d 50 (1980). "The measure of damages in relation to a breach of contract is the pecuniary value of the benefits the aggrieved

party would have received if the contract had not been breached." *Doe v Henry Ford Health Sys*, 308 Mich App 592, 601; 865 NW2d 915 (2014) (quotation marks and citation omitted). "The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Id*. (citation omitted). A party may not recover damages that are "conjectural or speculative in their nature, or dependent upon the chances of business or other contingencies[.]" *Id*. at 602 (citation omitted).

Here, the parties' agreement stated that Dillon agreed to sell, and New Products agreed to purchase, volumes of natural gas "at prices negotiated." Dillon's president testified that Dillon gave New Products the option to purchase natural gas through the spot market, and New Products elected to do so in February 2021. He also stated that New Products agreed to allow Dillon to balance its natural gas usage as part of a customer pool, rather than on an individual basis, to mitigate the risk of incurring penalties from MGU for using greater or lesser volumes of natural gas than nominated. Additionally, he stated that Dillon could not control the price of natural gas it purchased on the spot market, and each of Dillon's customers paid the same spot-market prices in February 2021. Based on this testimony, the trial court did not clearly err when it found that the parties agreed to the price charged for natural gas during the timeframe at issue. The negotiated the price for the supply of natural gas in February 2021 was simply the spot-market price, as contemplated by the parties' agreement.

Even if the trial court had clearly erred when it found that the parties agreed to the price charged for natural gas during the timeframe at issue, Dillon's invoice still reflected a reasonable price under Michigan's Uniform Commercial Code. Michigan's Uniform Commercial Code applies to contracts for the sale of goods such as natural gas. See MCL 440.2102. See also *Energy Reserves, Inc v Consumers Power Co*, 221 Mich App 210, 217; 561 NW2d 854 (1997). It provides that parties may contract for the sale of goods even if the price of the goods is not settled. See MCL 440.2305(1). In such cases, the price will be a reasonable one at the time of delivery if "nothing is said as to price" or "the price is to be fixed in terms of some agreed market . . . ." MCL 440.2305(1)(a) and (c). As addressed, Dillon's president testified that Dillon gave New Products the option to purchase natural gas through the spot market, and New Products elected to do so in February 2021. He also stated that New Products agreed to allow Dillon to balance its natural gas usage as part of a customer pool, rather than on an individual basis, to mitigate the risk of incurring penalties from MGU for using greater or lesser volumes of natural gas than nominated. Additionally, he stated that Dillon could not control the price of natural gas it purchased on the spot market, and each of Dillon's customers paid the same spot-market prices in February 2021. Based on this testimony, the trial court did not clearly err when it found Dillon's invoice reflected a reasonable price under Michigan's Uniform Commercial Code. Although the price of natural gas spiked in February 2021, New Products elected to purchase natural gas on the spot market and therefore assumed the risk of fluctuating prices.

Furthermore, the trial court did not clearly err when it found that Dillon proved its alleged damages with reasonable certainty. On February 28, 2021, Dillon invoiced New Products $62,916.01 for its natural gas use in February 2021. The invoice reflected that New Products used 2,589 units of natural gas, which was purchased on the spot market at a rate of $24.19 per unit. It also accounted for a utility charge, a prior credit, and sales tax. During the evidentiary hearing, Dillon's president testified that it calculated the invoiced balance by multiplying the volume of

natural gas MGU delivered to New Products by the average per-unit price of natural gas it purchased on the spot market for its customer pool during the entire month. He stated that MGU and Twin Eagle kept track of New Products's natural gas use, Dillon logged that information in its computer system, and Dillon's computer system calculated the average spot market rate for natural gas. He also stated that Dillon's accountant used the data and calculations in its computer systems to generate New Products's February 2021 invoice.[5] Dillon also successfully moved to admit an S&P Global Platts publication regarding the average price of natural gas in regions throughout the United States between February 1, 2021 and February 26, 2021. The publication provided that the average per-unit price of natural gas in the upper Midwest spiked to $71.665 between February 13, 2021 and February 16, 2021. It fell to $53.620 on February 17, 2021, and ranged from $2.520 to $15.205 throughout the remainder of the listed dates. New Products did not present any evidence that Dillon miscalculated the invoiced balance or misrepresented the extent to which the spot-market price of natural gas spiked in February 2021. Rather, its CEO simply testified that it refused to pay the amount because "we didn't understand the charge" and it was an "extraordinarily large bill that was way out of whack from anything received before." To the extent that New Products challenges the trial court's finding based on the credibility of Dillon's president, the trial court found Dillon's president to be credible, and we defer to "the trial court's superior ability to judge the credibility of the witnesses who appeared before it." *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 652; 662 NW2d 424 (2003) (quotation marks and citation omitted). See also MCR 2.613(C). Dillon's documentary evidence and supporting testimony was sufficient to establish its alleged damages with reasonable certainty.

We affirm.[6]

/s/ Noah P. Hood
/s/ Mark T. Boonstra
/s/ Kathleen A. Feeney

---

[5] During the evidentiary hearing, Dillon's counsel moved to admit a portion of a spreadsheet obtained from Dillon's computer system that purportedly included detailed information regarding the underlying bases for Dillon's calculations but the trial court excluded the proposed exhibit under MRE 106.

[6] In its reply brief, New Products argues that Dillon failed to establish that it breached the parties' agreement and, in fact, Dillon breached the parties' agreement. To the extent that New Products attempts to challenge the bases underlying the trial court's order granting summary disposition in Dillon's favor, it has waived such arguments on appeal. See *English v Blue Cross Blue Shield of Mich*, 263 Mich App 449, 459; 688 NW2d 523 (2004) ("An issue not contained in the statement of questions presented is waived on appeal.").