# STATE OF MICHIGAN

# COURT OF APPEALS

BEST TEAM EVER, INC., COACH INSIGNIA, L.L.C., DELI UNIQUE WEST BLOOMFIELD, INC., MILK & HONEY DETROIT, INC., NO. VI CHOPHOUSE DETROIT, INC., NORTHERN LAKES SEAFOOD RESTAURANT, PLAZA DELI SOUTHFIELD, INC., SOURDOUGH BAKERY, INC., TROWBRIDGE RESTAURANTS, INC., EPICUREAN GROUP, INC., MORELS, INC., and PARR DELI, INC.,

UNPUBLISHED
June 23, 2015

Plaintiffs-Appellees,

v

No. 319026
Oakland Circuit Court
LC No. 2012-127444-PD

MATTHEW K. PRENTICE,

Defendant-Appellant,

and

MICHIGAN BISTRO, ASMAR COMPANY, INC., INTERNATIONAL RESTAURANT GROUP, NWH HOLDINGS, ASMAR CAPITAL, MYKONOS TAVERNA, MORELS OF FARMINGTON HILLS, and JIMMY ASMAR,

Defendants.

Before: STEPHENS, P.J., and BORRELLO and GADOLA, JJ.

PER CURIAM.

Plaintiffs allege that defendant-appellant, Mathew K. Prentice, breached various noncompetition provisions in an employment agreement with plaintiff Trowbridge Restaurants, Inc. (TRI), and that Prentice converted plaintiffs' assets for his own business operations. Prentice appeals as of right from a judgment, entered after a bench trial, granting plaintiffs' request for injunctive relief and awarding damages to plaintiffs. We affirm.

-1-

# I. FACTS AND PROCEDURAL BACKGROUND

Prentice, a long-time chef, encountered financial difficulties in 2009 while operating restaurant and catering businesses in Wayne and Oakland counties. Facing foreclosure of certain restaurant assets by AMRESCO Commercial Finance, L.L.C.C. (AMRESCO), Prentice implored Stanley Dickson, Jr., to acquire those assets from AMRESCO in order to save the jobs of his employees and the reputation he had created through his business ventures. Dickson had met Prentice before 2009 through the Young Presidents Organization. Dickson was a member of a law firm and had an ownership interest in an accounting firm, but he also had business ventures outside of law and accounting. Dickson agreed to purchase the assets that were the subject of the foreclosure. He used TRI, which would transact business under the assumed name of Matt Prentice Restaurant Group, to purchase the assets. TRI also assumed several liabilities as part of the transaction with AMRESCO and Prentice. TRI also engaged in separate transactions to acquire the interests of Prentice and General Motors at another restaurant in the Renaissance Center in the Detroit.

The AMRESCO transaction did not involve Prentice's catering businesses, but the catering businesses were part of Dickson's overall transaction with Prentice, which also required Prentice to enter into an employment agreement with TRI. The employment agreement provided that Prentice would serve as the chief executive officer for TRI, whose business was described as "restaurants, catering, and all related goods and services." Prentice was hired as an employee at will, but agreed to several noncompetition provisions that would remain in effect during and after his employment ended. In January 2011, the employment agreement was amended to expand the meaning of the term "employer" to include TRI and "its successors and assigns, and any of its present or future subsidiaries, or organizations controlled by, controlling, or under common control with it."

In March 2012, while plans were in the works for new restaurants, including a Morels restaurant that would be opened under a lease being negotiated with Jimmy Asmar, Prentice informed Dickson that he was resigning his employment and would be going forward on his own with the new Morels restaurant and another restaurant, and that he would be assuming catering businesses at Temple Israel and Adat Shalom. Prentice took several key employees from plaintiffs after he resigned. He started operating under entities affiliated with Asmar. Dickson was unable to retain the catering business at Temple Israel. After a chaotic period in April 2012 during which Temple Israel either released payments to Prentice or withheld payments owed for catering services, Temple Israel obtained catering services only through Prentice.

This action was filed in June 2012. Pursuant to plaintiffs' amended complaint, TRI and other associated entities, including Epicurean Group, Inc., which had been formed to create a new brand for business operations (hereafter collectively referred to as "plaintiffs"), sought injunctive relief and money damages against Prentice, Asmar, and other business entities. By the time of trial in July 2013, all defendants except for Prentice had been dismissed. Prentice was then providing catering services at Temple Israel, but was operating through his own entity, Matt Prentice Events. The Morels restaurant and a steakhouse that Prentice opened as part of his association with Asmar had closed.

The trial court found that Prentice breached the employment agreement with TRI and converted plaintiffs' assets. The court found that the agreement was blatantly and repeatedly breached. It rejected Prentice's claim that the agreement, or various noncompetition provisions, were unenforceable. In addition to injunctive relief, the trial court awarded plaintiffs $500,000 in liquidated damages, $1 million for lost past and future profits for catering services at Temple Israel over a five-year period, and $52,346 for catering jobs that were executed by plaintiffs for Temple Israel, for which plaintiffs were never paid.

## II. STANDARD OF REVIEW

"This Court reviews a trial court's findings of fact following a bench trial for clear error and reviews de novo the trial court's conclusions of law." *Trader v Comerica Bank,* 293 Mich App 210, 215; 809 NW2d 429 (2011). An issue of contract interpretation is also reviewed de novo. *Id.* A finding is clearly erroneous where it lacks evidentiary support or this Court is left with a definite and firm conviction that a mistake was made. *Chelsea Investment Group LLC v City of Chelsea,* 288 Mich App 239, 251; 792 NW2d 781 (2010). We give deference to the trial court's special opportunity to evaluate the credibility of witnesses who appear before it. MCR 2.613(C).

## III. NONCOMPETITION AGREEMENT

Prentice challenges the enforceability of the noncompetition provisions that he agreed to in October 2009, as part of his employment agreement with TRI. Prentice argues that the trial court improperly relied on his acknowledgment in the employment agreement that the noncompetition agreement was reasonable, and failed to recognize that the Antitrust Reform Act, MCL 445.771 *et seq.*, requires a judicial determination of reasonableness that trumps the parties' freedom to contract. He requests that this Court determine whether the noncompetition agreement is unreasonable and unenforceable.

Section 4a(1) of the Antitrust Reform Act, MCL 445.774a(1), expressly allows an employer and an employee to enter into "an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business." MCL 445.774a(1). This statute was intended to revive common-law standards for enforcing noncompetition agreements. *Coates v Bastian Bros, Inc,* 276 Mich App 498, 507; 741 NW2d 539 (2007). At common law, the reasonableness of a noncompetition agreement was determined by the circumstances that existed when the agreement was made. *Hubbard v Miller,* 27 Mich 15, 19 (1873). The agreement must (1) have an honest and just purpose, (2) protect legitimate interests of the party in whose favor it is imposed, (3) be reasonable between the parties, and (4) not be specially injurious to the public. *St Clair Med, PC v Borgiel,* 270 Mich App 260, 266; 715 NW2d 914 (2006). "A court must assess the reasonableness of the noncompetition clause if a party has challenged its enforceability." *Coates,* 276 Mich App at 507-508. If the facts are undisputed, the reasonableness of a noncompetition provision is a question of law. *Id.* at 508. The burden of establishing reasonableness is on the party seeking to enforce the noncompetition provision. *Id.*

In this case, §§ 5 to 9 of the employment agreement address the competitive interests of the employer, who is defined as TRI,[1] solicitations of the employer's employees, disparaging remarks, inventions, and trade secrets. Prentice's substantive argument is directed only at his agreement in § 6(a) that, for a five-year term[2] after his employment ceases, he will not

> have any interest in (whether as founder, proprietor, officer, director or otherwise) enter the employment of, act as agent, broker, licensor or distributor for or adviser or consultant to, or in any way assist (whether by solicitation of customers or employees or otherwise) any individual, partnership, joint venture, corporation or other business entity directly or indirectly engaged in any business or enterprise which directly or indirectly competes with Employer in the business or the restaurants, catering, and all related goods and services or other activities engaged in by Employer at the time Employee ceases to be employed by Employer, to the extent competitive with Employer in the markets in which Employer operates;

Contrary to what Prentice argues, the trial court did not rely solely on freedom-of-contract principles to determine that the noncompetition provision was enforceable. The court relied in part on Prentice's acknowledgment in § 10 of the employment agreement that the "duration, activities restricted and geographic scope of the provisions set forth in Sections 5 through 9 are reasonable, and are reasonably necessary to protect the business and good will of Employer." Although the court reasoned that Prentice should be bound by this unambiguous language, see *Rory v Continental Ins Co,* 473 Mich 457, 468; 703 NW2d 23 (2005), it also independently determined that the noncompetition provision was reasonable. The record supports the trial court's decision.

The trial court rejected Prentice's argument that he was duped into signing the employment agreement by Dickson's lies and deception. Rather, the court found that Prentice had implored Dickson to acquire assets that would be lost in foreclosure, so that Prentice could salvage his goodwill and business reputation. Further, that it was contemplated that Dickson would invest additional money into the newly formed business, that it was believed that the new business would be successful only if Prentice was an employee, and that it was understood that Dickson would not move forward with this business venture without a five-year noncompetition agreement. The trial court also found that the market in which the businesses operated consisted of Wayne and Oakland counties. We find no clear error in the trial court's findings, and

---

[1] Section 12(d) provides that the agreement is binding on the parties and their respective successors and assigns. Further, the 2011 amendment to the agreement expanded the definition of "employer" to include other entities associated with TRI.

[2] Section 6 also provides that the five-year term is subject to the following tolling provision, that "[t]he running of the period during which the restrictions set forth in this Section 6 apply will be tolled during the continuance of any breach or violation by Employee of his covenants and agreements contained in this Section, and the period will be extended by the length of time during which any such breach or violation continues."

accordingly, we will evaluate the reasonableness of the noncompetition provision in ¶ 6(a) in light of those findings.

The five-year duration of the noncompetition provision after Prentice's employment ends is reasonable under the circumstances. Prentice was not a mere employee. Rather, his involvement was critical to the success of the businesses, and provided a means of salvaging the businesses and preserving his goodwill or "brand" as the chief executive officer of the businesses. Although Dickson did not purchase business assets directly from Prentice, the evidence supports the trial court's finding that Prentice's employment and continuation of the "brand" were essential to the transaction. Five years was a reasonable period for restricting Prentice's competition following the termination of his employment, considering that the period necessary to convert Prentice's goodwill or "brand" would not commence until Prentice's employment ended. See *Brillhart v Danneffel,* 36 Mich App 359, 364-365; 194 NW2d 63 (1971) (five-year covenant not to compete in a purchase contract for a restaurant business was reasonable where it allowed the purchaser to convert the restaurant's goodwill to the purchaser's own goodwill without direct competition from the seller).

We reject Prentice's argument that the tolling provision in § 10 of the employment agreement rendered the five-year duration unreasonable. The tolling provision in § 10 only applies should the court find that "the duration, activities restricted and geographic scope" of the provisions in § 6 are unreasonable and unenforceable. The court did not make that finding. The tolling provision in § 6 is applicable where, as here, there was breach or a violation of § 6. It ensures that there will actually be benefit from the five-year duration of the noncompetition provision. In essence, it is a contractual remedy that a trial court could itself provide in the absence of an agreement. See *Thermatool Corp v Borzym,* 227 Mich App 366, 375; 575 NW2d 334 (1998) (in appropriate circumstances, a court may extend the stated expiration date in a noncompetition agreement). Thus, it is not unreasonable.

With respect to the geographic area of the location, § 6(a) of the employment agreement limits it to "the markets in which Employer operates." The trial court reasonably found that this area was limited to Wayne and Oakland counties, which are the counties where Dickson's restaurants and catering services are located, and thus would be subject to competition from any business established by Prentice. We find no record support for Prentice's assertions that he could not make a living in the restaurant or catering business outside of those counties.

Lastly, with respect to the scope of the agreement, § 6(a) limits the noncompetition provision to "the business of restaurants, catering, and all related goods and services or other activities engaged in by Employer at the time Employee ceases to be employed[.]" Because the provision is limited to the type of activities engaged in by Dickson's business entities, it is reasonable. Further, considering that Prentice had been employed as the chief executive officer for plaintiffs' businesses, it was not unreasonable for the scope of the agreement to encompass activities beyond just work as a chef for a competitor.

In sum, giving deference to the trial court's findings, we conclude that the noncompetition provision in § 6(a) is reasonable in duration, geographical area, and the type of employment or line of business that is prohibited. Therefore, it is enforceable under MCL 445.774a(1).

IV.  DAMAGES — BREACH OF CONTRACT

A.  LIQUIDATED DAMAGES

Prentice also argues that any damages for breach of the employment agreement should have been limited to the liquidated damages of $500,000 set forth in § 11 of the agreement.  We disagree.

A court's primary task in construing a contact is to determine the parties' intent at the time the contract was made.  *Miller-Davis Co v Ahrens Constr, Inc,* 495 Mich 161, 174; 848 NW2d 95 (2014).  The parties' intent is determined by examining the contract language according to its plain and ordinary meaning.  *Id.*  Contractual words and phrases are also given meaning by their context or setting.  *Bloomfield Estates Improvement Ass'n v City of Birmingham,* 479 Mich 206, 215; 737 NW2d 670 (2007); see also *Hastings Mut Ins Co v Safety King, Inc,* 286 Mich App 287, 294; 778 NW2d 275 (2009).  If contract language is unambiguous, it is applied as written.  *Coates,* 276 Mich App at 503.

"A liquidated damages provision is simply an agreement by the parties fixing the amount of damages in the event of a breach and is enforceable if the amount is reasonable with relation to the possible injury suffered and not unconscionable or excessive."  *St Clair Med, PC,* 270 Mich App at 270-271.  It is particularly appropriate where actual damages are uncertain and difficult to ascertain or are speculative.  *Id.* at 271.  But this does not mean that the parties to a contract must agree to a liquidated damages provision as an exclusive remedy for a breach of contract.  See *Detroit Free Press v Miller,* 223 Mich 333, 335-336; 193 NW 779 (1923).  Nonetheless, under the election of remedies doctrine, a double recovery is not permitted for a single injury.  *Barclae v Zarb,* 300 Mich App 455, 486; 834 NW2d 100 (2013).  "A plaintiff may . . . simultaneously pursue all available remedies regardless of their legal consistency, if the plaintiff does not obtain a double recovery."  *Id.*

Section 11 of the employment agreement provides:

The parties hereto recognize that the services to be rendered by Employee under this Agreement are special, unique and of extraordinary character. Employee acknowledges that breach by Employee of the terms and conditions of any provisions of Section 5 through 9 of this Agreement will result in irreparable harm to Employer and Employer's Affiliates for which compensatory damages are an inadequate remedy.  Employee therefore agrees that in the event of such breach, *Employer will be entitled, if it so elects and in addition to all other remedies available to Employer both at equity and at law,* to institute and prosecute proceedings in any court of competent jurisdiction, either in law or equity, without the posting of any bond or security, to enjoin such breach and/or to specifically enforce the performance of Sections 5 through 9 of this Agreement. *Employee further agrees to a liquidated damage clause in the amount of $500,000.00.*  The waiver by the Employer of a breach of any provision of this Agreement by the Employee shall not operate or be construed as a waiver or any subsequent breach by the Employee.  No waiver shall be valid unless in writing and signed by an authorized officer of the Employer.  Employee will reimburse

Employer for all attorney's fees and expenses incurred by Employer and Affiliates of Employer in successfully enforcing such provisions. *This remedy is in addition to any other remedy available to Employer, by judicial proceedings or otherwise, for breach of any provision of this Agreement, including Sections 5 through 9.* Notwithstanding any breach by Employer of this Agreement, except if Employer refuses without cause to pay Employee amounts to which Employee is entitled hereunder, the provisions of Section 5 through 9 will remain in effect. [Emphasis added.]

Examined in context, it is clear from the sentence, "Employer will be entitled, if it so elects and in addition to all other remedies available to Employer both at equity an at law . . ." preceding the sentence addressing liquidating damages, without any mention of exclusivity, that the parties did not intend liquidated damages to be an exclusive remedy. Therefore, breach of contract damages are not fixed at $500,000.

In addition, the trial court clearly found multiple breaches of the employment agreement. It found repeated breaches of §§ 5, 6, and 7. It also found that § 1, which describes Prentice's employment position and responsibilities, was breached. Therefore, the trial court had a factual basis for applying the liquidated damages provision and awarding other damages that would not result in a double recovery for a single injury. Indeed, the court indicated that the difficulty in ascertaining damages for the loss of goodwill and reputation supported the liquidated damages award. Prentice has not established that the trial court awarded damages not contemplated by the employment agreement, or that it awarded both liquidated damages and actual damages for the same injury.

## B. LOST PROFITS — TEMPLE ISRAEL

Prentice raises three challenges to the trial court's award of $1 million for lost profits relating to the loss of the catering business at Temple Israel over the five-year term of the noncompetition agreement.

Prentice first argues that the award was unjustified because he was not the cause of the end of plaintiffs' contract with Temple Israel. "To recover in a breach of contract action, a plaintiff must prove that the defendant's breach was the proximate cause of the harm the plaintiff suffered." *Chelsea Investment Group LLC,* 288 Mich App at 254. "[T]he breach must be the most direct, natural, and foreseeable cause of the plaintiff's harm." *Id.* The recoverable damages are generally those that arise naturally from the breach and those damages contemplated by the parties at the time that contract was made. *Kewin v Massachusetts Mut Life Ins Co,* 409 Mich 401, 414; 295 NW2d 50 (1980). Any damages must also satisfy a "but for" test of causation. *Miller-Davis Co,* 495 Mich at 178-179.

The trial court found that Prentice breached the noncompetition in many respects, including by enticing catering employees to leave plaintiffs' employment, by actively soliciting the Temple Israel catering business, and by deciding to actually take over the Temple Israel business. Prentice's own testimony supports these findings. Prentice indicated that his catering services for Temple Israel spanned the time period before and after he was employed by plaintiffs. Prentice testified that he reached out to Temple Israel in late March 2012 in

conjunction with his resignation from plaintiffs. He described the next month as a "rocky month" during which plaintiffs tried to move him out of Temple Israel. He stated that plaintiffs continued to pay for food bills and that catering staff received paychecks from both himself and plaintiffs. As of May 1, 2012, however, Temple Israel went exclusively with Prentice's catering services and plaintiffs' relationship with Temple Israel ended.

We find no clear error in the trial court's finding that, but for Prentice's breach of the noncompetition agreement, profits from the catering business would have been earned by plaintiffs, and that plaintiffs will not be able to reclaim the lost business at Temple Israel even if the noncompetition provisions are enforced against Prentice. Both the "but for" test of causation and proximate causation are supported by the evidence that Prentice caused the circumstances that ultimately led to the severance of Temple Israel's relationship with plaintiffs, and plaintiffs' complete ouster as of May 1, 2012.

Prentice also argues that the amount of lost profits awarded to plaintiffs for the loss of the catering business at Temple Israel, $1 million, is speculative and excessive. We disagree.

Where the record reflects that the trial court was aware of the issues and correctly applied the law, and its award of damages is within the range of the evidence, clear error will not be found. *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 177; 530 NW2d 772 (1995). Damages in a common-law breach of contract action are intended to make the plaintiff whole. *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 586 n 4; 624 NW2d 180 (2001). Speculative damages are not recoverable. *Chelsea Inv Group LLC*, 288 Mich App at 255. "However, it is not necessary that damages be determined with mathematical certainty; rather, it is sufficient if a reasonable basis for computation exists." *Id.*

These rules apply equally to damages sought by a party for anticipated lost profits arising from breach of a contract. Lost profits need only be established with reasonable certainty. See *Fera v Village Plaza, Inc*, 396 Mich 639, 644; 242 NW2d 372 (1976); *Joerger v Gordon Food Serv*, 224 Mich App 167, 175; 568 NWW2d 365 (1997). Although lost profits may not be based solely on conjecture or speculation, the type of uncertainty that bars a recovery for lost profits is uncertainty as to the fact of the damages, not the amount. *Bonelli v Volkswagen of America, Inc*, 166 Mich App 483, 511; 421 NW2d 213 (1988). The law does not require a higher degree of certainty than the nature of the case at hand permits. *Id.* at 511-512.

In this case, the trial court considered two approaches to determining damages for lost profits, and arrived at the same amount under each approach. First, the trial court found that lost profits were readily ascertainable by considering the past profits for the catering services, an amount the court rounded down from $209,000 to $200,000, for the 12-month period ending in March 2012. Past profits may be used to measure future profits, but all the various contingencies by which such profits would probably be affected should be taken into account by the trier of fact. *Body Rustproofing, Inc v Mich Bell Tel Co*, 149 Mich App 385, 391; 385 NW2d 797 (1986). The court also used a "business valuation multiplier" approach, which Dickson testified is commonly used to value a business based on its income. Dickson testified that he applied a conservative factor of five to the rounded 12-month income total of $200,000 to arrive at a value of $1 million.

Prentice does not address the reasonableness of the trial court's methodology for calculating damages in this appeal. To the extent that Prentice's argument is directed at whether there was proof of the fact of lost profits, we find no clear error in the trial court's finding that plaintiffs sustained such damages because it is clear from the evidence that the catering services for Temple Israel were profitable. Contrary to what Prentice argues, the trial court did not base the $1 million award on an assumption that Prentice had to continue working with plaintiffs. Rather, the trial court found that Prentice's interference with plaintiffs' relationship with Temple Israel, in violation of the noncompetition agreement, caused the end of that relationship. The evidence supports the trial court's finding.

Lastly, Prentice argues that the $1 million award should be reduced by $261,730 (5 times $52,346) because the trial court allegedly made a duplicate award by separately awarding damages of $52,346, which were described as "lost profits for payment for executed catering jobs." We find no merit to this argument because the trial testimony does not indicate that the $52,346 amount was for lost profits in the sense used by the trial court to calculate the lost profits of $1 million, but rather represented payments owed to plaintiffs for past catering jobs from Temple Israel that plaintiffs never received because of Prentice's interference. Those damages were incurred in April when, according to Prentice's own testimony, Temple Israel refused to release payments to plaintiffs. While the $52,346 amount might contain some component of profit, the trial court's overall award of damages remains within the range of the evidence. Considering that damages need not be determined with mathematical certainty and the fact that the award of $1 million for lost profits was computed using only a rounded annual amount of $200,000, Prentice has not established that the trial court clearly erred in its determination of damages. *Triple E Produce Corp,* 209 Mich App at 177.

## V. CONVERSION

Lastly, Prentice argues that there was insufficient evidence to support the trial court's award of treble damages for conversion under MCL 600.2919a(1). We disagree.

The decision whether to award treble damages under MCL 600.2919a(1) is discretionary and, accordingly, is a question for the trier of fact. *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc,* 303 Mich App 441, 449-450; 844 NW2d 727 (2013), lv gtd 497 Mich 864 (2014). Conversion is an intentional tort in the sense that the converter's actions are willful. *Foremost Ins Co v Allstate Ins Co,* 439 Mich 378, 391; 486 NW2d 600 (1992). Conversion consists of "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Id.* This definition applies to both common-law conversion and statutory conversion under MCL 600.2919a. *Aroma Wines & Equip, Inc,* 303 Mich App at 447. Common-law conversion does not necessarily require a conversion of property to one's own use. *Id.* at 450. But a conversion of property for one's own use is one of the statutory requirements for treble damages in MCL 600.2919a(1). MCL 600.2919a(1)(a).

Prentice does not challenge the trial court's finding that the various items from the catering operations and the carpet for the Morels restaurant that the trial court found were converted, and were subject to treble damages under MCL 600.2919a(1), had a value of $158,015. In addition, Prentice's mere assertion that there was insufficient evidence to establish plaintiffs' ownership interest in the various items is inadequate to invoke appellate review of that

issue. *Movie Mania Metro, Inc v GZ DVD's Inc,* 306 Mich App 594, 605-606; 857 NW2d 677 (2014); see also *Mitcham v Detroit,* 355 Mich 182, 203; 94 NW2d 388 (1959).

We also reject Prentice's reliance on the standards applicable to MCL 600.2919a(1)(b), and our Supreme Court's interpretation of the knowledge element in the former version of that statute in *Echelon Homes, LLC v Carter Lumber Co,* 472 Mich 192, 197; 694 NW2d 544 (2005), to challenge the trial court's determination that his wrongful control over the various items supported an award of treble damages. Although the trial court cited MCL 600.2919a(1)(b), it substantively relied on the language in MCL 600.2919a(1)(a) to award treble damages. The relevant portion of MCL 600.2919a(1)(a) required plaintiffs to establish that Prentice converted the property to his own use. The term "use" requires that a person employ the property for some purpose. *Aroma Wines & Equip, Inc,* 303 Mich App at 447-448. Although the record indicates that Prentice acted with the assistance of Asmar and various entities to take control of the assets, we find no basis for disturbing the trial court's finding that Prentice's wrongful control over the assets rendered him liable for statutory conversion under MCL 600.2919a(1)(a). Therefore, we affirm the trial court's award of treble damages.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Stephen L. Borrello
/s/ Michael F. Gadola