*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* DPDF.

---

CMBF,

　　　　　　Petitioner-Appellee,

v

DPDF,

　　　　　　Respondent-Appellant.

UNPUBLISHED
May 19, 2022

No. 355799
Wayne Circuit Court
LC No. 19-101618-PP

---

Before: SWARTZLE, P.J., and CAMERON and PATEL, JJ.

PER CURIAM.

Respondent appeals as of right his convictions of three counts of criminal contempt for violating a domestic-relationship personal protection order (PPO). Respondent argues that there was insufficient evidence, he was denied due process, the convictions violate his First Amendment right to free speech, and the trial court erred by failing to conduct an analysis under MCL 750.411s. We affirm.

## I. BACKGROUND

Respondent and petitioner were previously married. They share joint legal custody of their minor child, DF, and have an agreed parenting-time schedule. In early 2019, petitioner petitioned for a domestic-relationship PPO alleging that respondent (or someone affiliated with him) threw a brick through petitioner's front window on two occasions, made several threatening gestures towards petitioner, sent threatening text messages to petitioner, and wrote disparaging Facebook posts regarding petitioner. The trial court issued a PPO prohibiting respondent from taking actions against petitioner that included, "stalking as defined under MCL 750.411h and MCL 750.411i . . . [by] sending mail or other communications to petitioner" and "threatening to kill or physically injure" petitioner.

The PPO was amended in May of 2019 after respondent filed a motion to terminate the PPO. Relevantly, there was still a prohibition on "threatening to kill or physically injure" petitioner and "stalking as defined under MCL 750.411h and MCL 750.411i," but "sending mail or other communications to petitioner" was no longer checked. Instead, the amended PPO included a condition that respondent was permitted to communicate with petitioner about DF and the parties' parenting-time schedules via "Our Family Wizard" ("OFW"), a messaging service which logged all communications. Petitioner moved to extend the PPO in January 2020, arguing that respondent continued to engage in harassing, threatening, and intimidating communications. The PPO was extended in March 2020 for one more year with the same conditions.

In Fall 2020, petitioner moved for a show-cause hearing, alleging that respondent violated the PPO by sending threatening OFW messages and threatening harm to petitioner in a Facebook post. Following a hearing,[1] the trial court found respondent guilty of three counts of criminal contempt for violating the PPO by (1) sending an OFW message to petitioner stating, in part: "You disrespect me, you reap what you sew [sic];" (2) sending an OFW message to petitioner stating, in part: "You keep on playing this division game, and we can take other measures to get your common sense in order;" and (3) by publishing a public Facebook post stating: "From me and other great Black Fathers, to miserable f***s posing as Black mothers/Grandmothers using kids as weapons against us—The best Fathers' Day present to us and that child . . . is for you to die. Asap." The trial court fined respondent $500 for each conviction. Respondent now appeals.

## II. STANDARD OF REVIEW

We review a trial court's decision to hold a party in contempt for an abuse of discretion. The nature of the contempt order and whether the contempt statute permitted the sanctions imposed are questions of law that are reviewed de novo. When examining the sufficiency of the evidence to support a criminal contempt finding following a bench trial, this Court views the evidence presented in a light most favorable to the prosecution to determine if the elements of the crime were proven beyond a reasonable doubt. Furthermore, the trial court's factual findings in a contempt proceeding are reviewed for clear error, and we must affirm if there is competent evidence to support them. We do not weigh the evidence or the credibility of the witnesses in determining whether there is competent evidence to support the findings. Circumstantial evidence and the reasonable inferences arising from that evidence can constitute satisfactory proof of the elements. [*In re JCB*, 336 Mich App 736, 747-748; 971 NW2d 705 (2021) (citations and quotation marks omitted).]

"Constitutional issues, as questions of law, are reviewed de novo." *TM v MZ*, 326 Mich App 227, 236; 926 NW2d 900 (2018). Additionally, questions of law, including interpretation of

---

[1] The parties stipulated to a hearing on the show-cause motion on the same date as the parties' hearing for parenting-time issues in the divorce case. On the date of the hearings, the trial court first held a hearing on the parenting-time issues, then recessed and returned for a hearing on the show-cause motion.

statutes, court rules, and "the nature of [a] contempt order," are reviewed de novo. See *In re JCB*, 336 Mich App at 747, 753.

## III. SUFFICIENCY OF THE EVIDENCE

Respondent contends that there was insufficient evidence to support his criminal-contempt convictions. We disagree.

MCL 600.2950 governs domestic-relationship PPOs. *TM v MZ*, 501 Mich at 315. MCL 600.2950(1)(j) authorizes a trial court to restrain an individual from "[a]ny other specific act or conduct . . . that causes a reasonable apprehension of violence." In this case, the governing PPO prohibited respondent from taking actions against petitioner that included, "stalking as defined under MCL 750.411h and MCL 750.411i" and "threatening to kill or physically injure" petitioner. A person who fails to comply with a PPO is subject to the criminal contempt powers of the court. MCL 600.2950(23). A petitioner has the burden of proving a respondent's guilt of criminal contempt beyond a reasonable doubt at a show-cause hearing. MCR 3.708(H)(3).

Petitioner testified that she felt threatened, intimidated, fearful, nervous, and experienced increased anxiety and fear when she received respondent's messages via OFW. Petitioner testified that the language, tone, content, and frequency of the respondent's OFW messages caused her to experience mental and emotional distress each time she received one. Although petitioner and respondent are not connected on social media, petitioner testified that someone contacted her out of concern for her safety and directed her attention to a public post that the respondent made on Facebook: "From me and other great Black Fathers, to miserable f***s posing as Black mothers/Grandmothers using kids as weapons against us—The best Fathers' Day present to us and that child . . . is for you to die. Asap." While the post did not directly mention petitioner, she inferred that respondent was referencing her since she is the mother of his only child. After reading the post, she was fearful that she would be harmed.

Respondent conceded that he made each of the statements that were before the trial court, but denied that any of them were meant as threats towards the respondent. While he offered explanations for each of the statements at issue, he also boldly declared that he believed that petitioner was "less than feces," that he could care less if she burns, that he was not concerned with her physical safety, and that "black mother who are using their kids as weapons against black fathers who are present [are] not needed in this world . . ."

The trial court made the following pertinent findings on the record:

> The May 22nd violation was the violation of the communication between [respondent], telling [petitioner] that she will reap what she sows. . . . the Court is interpreting that as a direct threat against [petitioner], specifically designed to illicit a response from her. And, that response as [petitioner] testified to, was a fear of— she was intimidated, she said she felt fear, retaliation, and that he was threatening her. And, that was the repeated theme throughout the case upon presentation of these messages.

> The second violation is . . . [respondent]'s communication to [petitioner] on June 5th when he stated to her that we can take other message [sic] to get your

-3-

common sense in order. . . . The Court found that to be a threat when he reached out and he said that.

When he said that he was going to take other measures, specifically, [petitioner] testified that she again felt intimidated, that she felt fear, and retaliation, and that that was indeed a threat to her.

The . . . final violation . . . was the Facebook message. . . . [respondent] thinks that he's quite clever, I get that, I've seen that in his testimony thus far. And, so, he's posting this message to the broader audience of the world. His message obviously was seen by a general audience. If you read it specifically, although it was not directed to [petitioner], it specifically is referencing her.

* * * *

I find that [the respondent] is in criminal contempt beyond a reasonable doubt. He has willfully and clearly, and unequivocally violated this Court's order with those three instances specifically.

The trial court was entitled to weigh the direct and circumstantial evidence and make fact findings. *In re JCB*, 336 Mich App at 748. We review those factual findings for clear error and, in doing so, we may not weigh the evidence or credibility of witnesses. *Id.* Evidence was presented that petitioner felt harassed, threatened, and frightened by the OFW messages and the Facebook post. The trial court found this evidence to be credible, rejected respondent's attempt to cloak the OFW messages as necessary parenting time communications, and concluded that respondent violated the PPO.[2] We conclude that the evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that respondent violated the PPO by threatening to kill or physically injure petitioner in each of the three instances cited by the trial court.[3] Accordingly, respondent was properly found in criminal contempt.

---

[2] Although the trial court could have provided more details regarding the basis for its decision, it complied with the provisions of MCR 3.708(H)(4). The trial court's decision reflects that it was aware of the issues, correctly applied the terms of the PPO to the facts, and found respondent in criminal contempt for violating the PPO. *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 176; 530 NW2d 772 (1995).

[3] The trial court did not specify whether responded violated "stalking" as outlined in sub-paragraph (e) of the PPO or "threatening to kill or physically injure" petitioner as outlined in sub-paragraph (g). Because we find that the evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that respondent violated sub-paragraph (g) of the PPO, it is not necessary for us to address whether there was sufficient evidence to permit a rational trier of fact to find beyond a reasonable doubt that respondent violated the stalking provision of the PPO.

## IV. DEPRIVATION OF DUE PROCESS

Respondent argues that he was deprived of due process of law because the criminal contempt matter was improperly influenced by the trial court's knowledge of facts from the underlying proceedings and the trial court made comments that suggested its predetermination of respondent's guilt prior to the contempt hearing. We disagree.

Respondent failed to object to the manner in which the trial court conducted the parenting-time and show-cause hearings and failed to object to the trial court's comments during the parenting-time hearing. This Court reviews unpreserved issues for plain error. *In re Contempt of Henry*, 282 Mich App 656, 666; 765 NW2d 44 (2009).[4]

This Court has explained the due process rights afforded to an alleged criminal contemnor:

> A criminal contempt proceeding requires some of the safeguards of an ordinary criminal trial. A respondent charged with contempt is entitled to be informed whether the proceedings are civil or criminal. Further, a respondent in a criminal contempt proceeding is entitled to be informed of the charge, to be given an opportunity to prepare his or her defense, and to secure the assistance of counsel. The respondent has a presumption of innocence and a right against self-incrimination. [*Id.* (citations and quotation marks omitted).]

"When adjudicating contempt proceedings without a jury, a court must make findings of fact, state its conclusions of law, and direct entry of the appropriate judgment." *Id.* at 674; see also MCR 3.708(H)(4).

Respondent generally argues the trial court's knowledge of the parties' parenting time issues violated respondent's procedural due-process rights. Respondent has not demonstrated any error with the manner in which the show-cause hearing was conducted.[5] Further, we are not persuaded that the trial court's comments during the parenting-time hearing reflected any bias or a "predetermined outcome." Respondent has not demonstrated error, let alone plain error.

---

[4] "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *In re Contempt of Henry*, 282 Mich App at 666. (citations omitted).

[5] The show-cause hearing was separate from the parenting-time hearing. Respondent was afforded an opportunity to cross-examine petitioner and expressly declined to call any witnesses on his behalf. The trial court applied the rules of evidence, emphasized that petitioner had the burden of proving PPO violations beyond a reasonable doubt, limited the issues to the matters raised in petitioner's show-cause motion, and declined to consider extraneous evidence or argument. At the conclusion of the hearing, the trial court made factual findings, stated its conclusions of law, and directed entry of a judgment.

## V. FIRST AMENDMENT

Respondent argues that the trial court erred convicting him on the basis of his social media post without making a finding that the post was not constitutionally protected. Although the trial court did not conduct a complete First Amendment analysis, we review this constitutional issue de novo[6] and conclude that the Facebook post was not constitutionally-protected speech.

"[T]he First Amendment limits the extent to which states may punish or criminalize the use of words or language." *In re JP*, 330 Mich App 1, 16; 944 NW2d 422 (2019). However, the "right to speak freely is not absolute." *TM v MZ*, 326 Mich App at 237 (citations omitted). "[A] State may punish those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace," including "fighting words," "inciting or producing imminent lawless action," and "true threat[s]." *Id.* at 238 (citations omitted). The United States Supreme Court has explained "true threats" as follows:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death. [*Virginia v Black,* 538 US 343, 359-360; 123 S Ct 1536; 155 L Ed 2d 535 (2003) (citations and parentheticals omitted).]

The PPO precluded respondent from threatening to kill or physically injure respondent. A state may restrict and regulate "true threats" to protect people from the possibility of violence and to protect individuals from the fear of violence. *RAV v City of Saint Paul*, 505 US 377, 388; 112 S Ct 2538; 120 L Ed 2d 305 (1992). Respondent publicly threatened death to "Black mothers/Grandmothers using kids as weapons against us," which would include petitioner as the mother of respondent's only child. The evidence establishes that respondent was aware of the audience of his Facebook post and knew that petitioner might feel threatened.[7] This is not the type of speech that our Constitution protects.

---

[6] *TM*, 326 Mich App at 236.

[7] An individual posted a reply to the Facebook post stating, "Easy Bobba folks will screen shot this and take it to court and say you have anger issues or threatening them." Respondent replied

> [l]et them. It's called a 1st Amendment right of expression of a personal frustration or view of anothers'. Besides . . a [MF] should'nt [sic] be stalking my comment if I'm not a worry to them. I hear you though.

## VI.  MCL 750.411S

Respondent argues the trial court erred by failing to conduct an analysis of MCL 750.411s. We disagree.

Respondent did not raise the applicability of MCL 750.411s in the trial court, so we review this issue for plain error. *In re Contempt of Henry*, 282 Mich App at 666.

The domestic-relationship PPO in this case was governed by MCL 600.2950, which does not contain references to MCL 750.411s.[8] Further, neither the original, nor the subsequent PPOs in this case referenced MCL 750.411s. We conclude there was no error, let alone plain error, in the trial court's failure to address MCL 750.411s.

## VII.  CONCLUSION

We conclude that there was sufficient evidence to support each of respondent's three criminal contempt convictions, there were no due process violations, respondent's Facebook post was not constitutionally-protected speech, and MCL 750.411s is inapplicable. Accordingly, we affirm respondent's convictions.

/s/ Brock A. Swartzle
/s/ Thomas C. Cameron
/s/ Sima G. Patel

---

[8] Respondent argues that a PPO issued under MCL 600.2950a must indicate that it restrains or enjoins conduct prohibited by MCL 600.2950a. But MCL 600.2950a pertains to nondomestic PPOs.