TRIPLE E PRODUCE CORPORATION v MASTRONARDI
PRODUCE, LTD

Docket Nos. 146743, 150418. Submitted May 10, 1994, at Lansing.
Decided March 6, 1995, at 9:25 A.M. Leave to appeal sought.

Triple E Produce Corporation and Esfresh Produce, Inc., brought
an action in the Wayne Circuit Court against Mastronardi
Produce, Ltd., seeking indemnification following the plaintiffs'
payment of withdrawal liability assessed against the plaintiffs
pursuant to federal law by a multiemployer pension fund after
the plaintiffs closed the business they had purchased from the
defendant and withdrew from the fund. The trial court, Kaye
Tertzag, J., entered a judgment for the plaintiffs after finding
that the agreement to indemnify contained in the parties'
purchase agreement required the defendant to indemnify the
plaintiffs. The defendant appealed separately from the judg-
ment and from a subsequent award for the plaintiffs of attor-
ney fees. The appeals were consolidated by the Court of Ap-
peals.

The Court of Appeals *held:*

1. The indemnity clause clearly indicates that the parties
intended to protect the plaintiffs from the type of liability
imposed here.

2. The trial court did not clearly err in finding that Robert
Mastronardi, the president of the company purchased by the
plaintiffs, knew or should have known of the potential for the
withdrawal liability.

3. The federal cases that have addressed the issue of with-
drawal liability and have found that withdrawal liability does
not arise under the relevant federal acts until the time of the
actual withdrawal from the pension fund, precluding liability
on the part of former owners of businesses that later close, are
not dispositive in this case because the indemnification issue in
this case is predominately one of contract law rather than one
of statutory construction of the relevant federal acts.

4. The trial court did not err, in light of the totality of the

REFERENCES
Am Jur 2d, Appeal and Error § 355; Indemnity § 13.
See ALR Index under Appeal and Error; Indemnity.

circumstances surrounding the parties and their contract, in ruling that the plaintiffs were entitled to indemnification.

5. The plaintiffs met their burden of proof regarding damages. The plaintiffs also satisfied their burden of going forward with the evidence, thereby shifting that burden to the defendant. The defendant failed to rebut the plaintiffs' evidence regarding the proper calculation of withdrawal liability.

6. No clear error occurred with regard to the trial court's award of damages. Although the court did not make an independent finding regarding damages by explaining the basis for its award of damages, the court was aware of the issues and correctly applied the law, and the award was within the range of the evidence. The case need not be remanded because any further explanation by the trial court would not facilitate appellate review.

7. The trial court had jurisdiction to enter the award of attorney fees after the claim of appeal was filed in the Court of Appeals. The trial court properly had reserved the right to consider the motion for attorney fees with regard to which evidence was presented at trial if the motion was filed within twenty-one days from the date of the entry of the judgment. The motion for attorney fees was timely.

Affirmed.

1. INDEMNITY — CONTRACTS — JUDICIAL CONSTRUCTION.

An indemnity contract is construed in accordance with the rules for the construction of contracts in general and to effectuate the intent of the parties, which may be determined by considering the language of the contract, the situation of the parties, and the circumstances surrounding the making of the contract.

2. INDEMNITY — CONTRACTS — JUDICIAL CONSTRUCTION.

An indemnity contract is to be construed strictly against the party who drafts the contract and the party who is the indemnitee.

3. MOTIONS AND ORDERS — ATTORNEY FEES — JURISDICTION TO ENTER ORDERS.

A trial court has jurisdiction to enter an order awarding attorney fees, with regard to which evidence was presented at trial, after a claim of appeal is filed in the Court of Appeals where the trial court's order of judgment reserves the right to entertain a motion for attorney fees filed within a certain number of days from the entry of the judgment and a timely motion is filed.

*Weisman, Trogan, Young & Schloss, P.C.* (by *John A. Ruemenapp*), for the plaintiffs.

*Strobl & Manoogian, P.C.* (by *John Sharp*) (*D'Agostini, Sable & Ruggeri, P.C.,* by *Richard J. Sable,* of Counsel), for the defendant.

Before: WHITE, P.J., and HOLBROOK, JR., and E. A. QUINNELL,* JJ.

HOLBROOK, JR., J. Defendant appeals as of right from a judgment entered for plaintiffs, awarding them $40,000 in damages as indemnification for "withdrawal liability" assessed against them by a multiemployer pension fund pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 USC 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 USC 1381 *et seq.* The "withdrawal liability" had been assessed against plaintiffs after they closed the business they had purchased from defendant and withdrew from the fund. Defendant also appeals from a subsequent award for the plaintiffs of $20,000 in attorney fees. The appeals were consolidated by the Court of Appeals. We affirm.

I

Triple E Produce Corporation, a farming and packing business, supplied produce to Harry Becker Produce Company for many years. Defendant Mastronardi Produce, Ltd. (Mastronardi), acquired Becker in 1972, and Robert Mastronardi was president of Becker until the mid-1980s. In the early- to mid-1980s, Mastronardi began to have difficulty paying amounts that it owed to Triple E. During this time, Robert Mastronardi met with Nathan and Joe Esformes, principals of Triple E, to discuss Mastronardi's financial problems. As a

---

* Circuit judge, sitting on the Court of Appeals by assignment.

result of those discussions, Triple E agreed to "work with" Becker while it tried to become profitable. Triple E continued to supply Becker, but Becker's debt to Triple E grew to approximately $800,000 by early 1986. Robert Mastronardi contemplated closing Becker.

To resolve the debt, Triple E agreed to acquire Becker from Mastronardi and assume the debt to itself. Apparently, Triple E hoped to recoup some of the debt by operating the company itself. Before acquiring Becker, Triple E sent one of its employees, Paul Draper, to Detroit to supervise Becker's operations. At Draper's request, an accounting firm prepared financial statements for Becker before the acquisition. Draper also retained an attorney to negotiate and prepare a purchase agreement. Although Robert Mastronardi was represented by counsel during part of the negotiations, he was not represented at closing. The purchase agreement became effective November 1, 1986, when all of Becker's stock was transferred to Triple E for one dollar. As part of the agreement, Robert Mastronardi was to work for Becker for ten years at a salary of $75,000 a year.

Triple E operated Becker but found that it could not make a profit and decided to close the business and discontinue operations in 1988. Under the ownership of both Mastronardi and Triple E, Becker had a collective bargaining agreement with the Teamsters union and, pursuant to that agreement, had been making payments to the Central States Pension Fund, a multiemployer pension fund. When Becker closed its business and stopped making payments to the pension fund, it was assessed "withdrawal liability" pursuant to the ERISA, as amended by the MPPAA. Triple E incurred approximately $30,000 in attorney fees to defend

against the claim by the fund, but eventually paid $127,059.45 in withdrawal liability.

When Triple E's request for indemnification from Mastronardi was refused, Triple E began this action to recover under the parties' contract, relying on the following indemnity clause in the purchase agreement, which provided in pertinent part:

Section 12.1 *Agreement to Indemnify.* The seller shall unconditionally indemnify and hold harmless Corporation, Buyer, and/or their successors and assigns, against and in respect of any and all liabilities, loss, cost, damage, interest, legal fees and other expenses, of whatsoever kind or nature, incurred by Corporation, Buyer and/or their successors and assigns, by reason of: (a) any claims, of whatsoever kind or nature, against Corporation of any nature, whether accrued, matured, unmatured, absolute, contingent or otherwise and which arise out of the operations of Corporation prior to the closing date, or which are based upon any facts in existence prior to the closing date which are known to Seller, or should have been known to Seller, or (b) any claims against any of the Shares being purchased by Buyer hereunder or arising out of the operation of Corporation and which first arose prior to the closing date or which are based upon facts in existence prior to the closing date, or (c) any claims against, or cost, expense or liability of Corporation, Buyer, and/or their successors and assigns, arising out of, related to, or connected with the claims which are the subject matter of the litigation described on the annexed Schedule 3.17 and referred to in Section 3.17 hereof; or (d) any breach of any representation, warranty or covenant contained in this Agreement; all such claims described in (a), (b), (c) and (d) being hereinafter individually called "Claim" and collectively called "Claims".

At the bench trial, Nathan Esformes testified

that he was unaware of the potential assessment of withdrawal liability at the time he and his brother decided to discontinue operations at Becker and withdraw from the pension fund. He understood the indemnity clause in the purchase agreement to mean that Mastronardi would indemnify Triple E for liabilities that might not have been reflected in the financial statements.

Robert Mastronardi testified that he was unaware of the potential for withdrawal liability before the sale of Becker to Triple E. He admitted that he may have received annual statements from the fund, but testified that he did not read the statements and denied that he knew that the fund was underfunded. He testified that, as president of Becker, he negotiated labor contracts with the Teamsters himself, that he received mail from the fund and read some of it, and that he personally negotiated with plaintiffs' attorney for the sale of Becker. Robert Mastronardi insisted, however, that no one associated with Mastronardi knew about the unfunded pension liability.

The trial court adopted plaintiffs' proposed findings of fact, except for the portion referring to damages, and awarded judgment for plaintiffs in the amount of $40,000, without explaining its basis for the award. Defendant appeals as of right.

II

Relying on certain federal court decisions, defendant asserts that withdrawal liability did not accrue until plaintiffs withdrew from the pension fund and, therefore, defendant, as a predecessor employer, cannot be held liable. We disagree.

Drawing from its findings of fact, the trial court concluded:

The imposition of withdrawal liability triggers indemnification under both of these clauses [in § 12.1]. As evidenced by Trial Exhibit #4, the unfunded, vested liability (which eventually resulted in the imposition of withdrawal liability) existed well prior to Triple's acquisition of Becker and resulted from Becker's operations prior to the acquisition. This unfunded, vested liability—while neither mature nor liquidated at the time of the acquisition—became due upon demand by the Fund. The claim of the Fund, therefore, fits squarely within the indemnity provision as a "liability, loss, cost, damage . . . of whatsoever kind or nature incurred . . . by reason of any . . . claim of whatsoever kind or nature" whether "accrued, matured, unmatured, absolute, contingent or otherwise." It was out there, ready to pounce on an unwitting buyer. This type of potential claim had to be [the] type of thing covered by the indemnity. Clearly it was intended to be so according to the testimony of Howard Young.

In addition, facts in existence prior to the closing date (i.e., an unfunded, vested liability) and either known to Mastronardi or should have been known to Mastronardi—as a result of its receipt of annual statements—gave rise to the imposition of withdrawal liability. Indemnification is required.

Accordingly, even though only one of the clauses of Section 12.1(a) need be satisfied to find for the Plaintiffs in this case, the Court finds that both clauses are satisfied in this case.

This Court reviews a trial court's findings of fact for clear error. MCR 2.613(C); *In re Stafford,* 200 Mich App 41, 42-43; 503 NW2d 678 (1993). A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Tuttle v Dep't of State Hwys,* 397 Mich 44, 46; 243 NW2d 244 (1976).

The question presented in this case is predominately a question of contract law rather than a

question of statutory construction under the
MPPAA. See *D C Transportation Services v Coca-
Cola Bottling Co,* 853 F Supp 1002, 1007-1008 (ND
Ohio, 1994). Cf. *Global Leasing, Inc v Henkel Corp,*
744 F Supp 595 (D NJ, 1990). This case does not
involve a direct claim for "withdrawal liability"
against or by an "employer" under the MPPAA, but,
rather, involves the contractual obligation of one
party to indemnify another for such an assess-
ment. Although a determination of when "with-
drawal liability" arises under the MPPAA is instruc-
tive, it is not dispositive under these facts. Instead,
we view this action for breach of contract as
controlled by the intent of the parties in making
their contract. Accordingly, our paramount consid-
eration is to discern whether the withdrawal lia-
bility assessed against plaintiffs constituted an
indemnifiable liability, loss, cost, or damage, as
contemplated by the parties in § 12.1 of their
contract.

An indemnity contract is construed in accor-
dance with the rules for the construction of con-
tracts in general. *Pritts v J I Case Co,* 108 Mich
App 22, 29; 310 NW2d 261 (1981). Indemnity con-
tracts should be construed to effectuate the intent
of the parties, which may be determined by consid-
ering the language of the contract, the situation of
the parties, and the circumstances surrounding
the making of the contract. *Id.; Calladine v Hyster
Co,* 155 Mich App 175, 182; 399 NW2d 404 (1986).
An indemnity contract will be construed strictly
against the party who drafts the contract and the
party who was the indemnitee. *Michigan Chande-
lier Co v Morse,* 297 Mich 41; 297 NW 64 (1941);
*Beaudin v Michigan Bell Telephone Co,* 157 Mich
App 185, 188; 403 NW2d 76 (1986).

Here, the purchase agreement was drafted by
plaintiffs' attorney. Therefore, the indemnity

clause must be strictly construed against plaintiffs as indemnitees. *Id.* Nonetheless, we find that the broad, all-inclusive language of the indemnity clause is a clear indicator that the parties intended to protect plaintiffs against the type of liability imposed here. Indeed, the use of the term "all" in an indemnity clause has been interpreted to provide for the broadest possible indemnification. *Calladine, supra.* Moreover, the circumstances surrounding the making of the contract and the purposes sought to be accomplished are also clear indicators of the parties' intentions. Because § 12.1 was subject to negotiation by the parties, we view plaintiffs' attempt to inhibit their exposure to risk as reasonable insofar as they were acquiring a company that, on paper, was virtually worthless. See *Artistic Carton Co v Paper Industry Union-Management Pension Fund,* 971 F2d 1346, 1353 (CA 7, 1992).

In another context, a buyer's decision to terminate operations, resulting in withdrawal liability, might be regarded as beyond the seller's undertaking in an indemnity agreement. However, in this case, the trial court did not err in concluding that the buyer did not assume the risks attendant to closing the already insolvent business and that the parties intended to indemnify the buyer for risks such as withdrawal liability.

Contrary to defendant's claim, we find no clear error by the trial court in finding that Mastronardi knew or should have known of the potential for withdrawal liability. Robert Mastronardi admitted at trial that he had received annual statements from the fund, but denied reading the statements or receiving special bulletins regarding the fund's unfunded liability. He further testified that he personally negotiated the collective bargaining agreements with the Teamsters when he was pres-

ident of Becker. Because questions of credibility and intent are properly resolved by the trier of fact, MCR 2.613(C), we find no clear error by the trial court in finding that Mastronardi knew or should have known of the potential for withdrawal liability.

Neither do we find any basis for defendant's assertion that the trial court improperly relied on § 4.1 of the contract in making its conclusions of law. By its terms, the representations and warranties in Article 4 of the contract were effective only for one year after the effective date of the purchase agreement. While the trial court mentioned this provision, there is no indication that it relied on it. There was no error.

We recognize that the federal courts that have addressed this issue have found that withdrawal liability does not arise under the MPPAA until the time of actual withdrawal from the pension fund, precluding liability on the part of former owners of businesses that later close. See *Godchaux v Conveying Techniques, Inc,* 846 F2d 306 (CA 5, 1988); *Teamsters Pension Trust Fund v Central Michigan Trucking, Inc,* 857 F2d 1107 (CA 6, 1988). The trial court in this case declined to follow federal case law, finding that those decisions were not binding precedent and that the cases were distinguishable factually. Because we have analyzed this issue as predominately one of contract law, rather than one of statutory construction under the MPPAA, we do not find the *Godchaux*[1] and *Teamsters Pension Trust Fund* cases to be dispositive under these facts.

Accordingly, in light of the totality of the cir-

_____

[1] We further note that the *Godchaux* court focused on the term "liabilities," because that term defined the seller's obligations to disclose and to indemnify. Here, the indemnity agreement is not limited to liabilities, but includes "liabilities, loss, cost, damage, interest, legal fees and other expenses, of whatsoever kind or nature."

cumstances surrounding the parties and the contract in this case, we conclude that the trial court did not err in ruling that plaintiffs were entitled to indemnification from defendant.

III

Defendant next asserts that plaintiffs failed to carry their burden of proof regarding damages. We disagree.

We find no merit to defendant's claim that the trial court abused its discretion in permitting Howard Young to testify as an expert witness regarding the method of calculating the amount of withdrawal liability. Although Young did not appear to be extremely knowledgeable about the subject, the limits of his knowledge were revealed in his testimony and properly went to its weight rather than its admissibility. MRE 702; *Mulholland v DEC Int'l Corp,* 432 Mich 395, 406; 443 NW2d 340 (1989); *Gingold v Berkley Clinic, PC,* 204 Mich App 148, 151; 514 NW2d 469 (1994). Moreover, an expert witness may base an opinion on hearsay or on the findings and opinions of other experts. MRE 703; *People v Dobben,* 440 Mich 679, 695-696; 488 NW2d 726 (1992). Thus, we find no error in Young's basing his opinion on information provided by employees of the fund. Finally, even if Young's testimony was incorrect regarding proper application of the de minimis rule, defendant had an opportunity to cross-examine Young at trial and present its own expert witness or other evidence regarding calculation of withdrawal liability.

In this context, defendant's claim that plaintiffs failed to carry their burden of proof is also without merit. A plaintiff's burden of proof encompasses two separate concepts: (1) the burden of persua-

sion, and (2) the burden of going forward with the evidence. *Kar v Hogan,* 399 Mich 529, 539; 251 NW2d 77 (1976); *Jones & Laughlin Steel Corp v Warren,* 193 Mich App 348, 354-355; 483 NW2d 416 (1992). While the former does not shift during the course of a trial, the latter may shift to the opposing party. *Id.* at 355. Here, plaintiffs clearly satisfied their burden of going forward with the evidence, thereby shifting that burden to defendant. Defendant failed, however, to rebut plaintiffs' evidence regarding the proper calculation of withdrawal liability. Accordingly, the trial court did not abuse its discretion in admitting and giving probative effect to Howard Young's testimony.

### IV

Defendant next asserts that remand is necessary to permit the trial court to explain its award of $40,000 in damages. We disagree.

A trial court sitting without a jury must make specific findings of fact, state its conclusions of law separately, and direct entry of the appropriate judgment. MCR 2.517(A)(1). A finding of fact made by a trial court sitting without a jury is essentially a verdict, which may include an award of damages. *Precopio v Detroit,* 415 Mich 457, 467; 330 NW2d 802 (1982); *Donohue v Wayne Circuit Judge,* 238 Mich 253, 256; 213 NW 150 (1927); *Riggs v Fremont Mutual Ins Co,* 85 Mich App 203, 206; 270 NW2d 654 (1978). Findings of fact regarding matters contested at a bench trial are sufficient if they are "[b]rief, definite, and pertinent," and it appears that the trial court was aware of the issues in the case and correctly applied the law, and where appellate review would not be facilitated by requiring further explanation. MCR 2.517(A)(2); *People v Porter,* 169 Mich App 190,

194; 425 NW2d 514 (1988). As with other findings of fact, an award of damages is reviewed on appeal pursuant to the clearly erroneous standard. *Precopio, supra* at 465-467.

Here, the trial court adopted plaintiffs' proposed findings of fact and conclusions of law, except for those dealing with damages. The court made no independent finding regarding damages but merely entered judgment for plaintiffs and awarded $40,000 in damages. Because we have concluded that the trial court was aware of the issues and correctly applied the law, and because the award was within the range of the evidence, we find no clear error in the award. Accordingly, remand is unnecessary because any further explanation by the trial court would not facilitate appellate review.

v

Lastly, defendant asserts that the trial court lacked jurisdiction to enter an order awarding $20,000 in attorney fees after the claim of appeal was filed in this Court. We disagree.

In the order of judgment, entered October 30, 1991, the court reserved the right to entertain a motion for attorney fees as long as it was "filed within 21 days from the date of entry hereof." Plaintiffs filed a timely motion for attorney fees on November 11, 1991. Thus, although the claim of appeal was filed on October 31, 1991, the trial court properly had reserved the right to consider a motion for attorney fees, including fees incurred under the indemnity agreement with regard to which evidence was presented at trial. See *Lincoln v Gupta,* 142 Mich App 615, 631; 370 NW2d 312 (1985). Regarding the amount of attorney fees, while the court did not indicate an apportionment between mediation sanctions and attorney fees

incurred under the indemnity provision, the total amount was supported by the evidence and plaintiffs' other documentation. Accordingly, we affirm the trial court's order awarding attorney fees.

Affirmed.