*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MELANIE CULP and JERRY CULP,

        Plaintiffs/Counterdefendants-
        Appellees/Cross-Appellants,

v

JOHN TRIMBERGER,

        Defendant-Cross-Appellee,

and

QUANTUM FLOOR PREP & COATINGS, LLC,

        Defendant/Cross-Plaintiff-
        Appellant/Cross-Appellee.

UNPUBLISHED
November 13, 2024
3:27 PM

No. 366133
Kalamazoo Circuit Court
LC No. 2021-000340-CB

Before: BOONSTRA, P.J., and MURRAY and CAMERON, JJ.

PER CURIAM.

Defendant Quantum Floor Prep & Coatings, LLC (Quantum), appeals by right the judgment entered in favor of plaintiffs, Melanie and Jerry Culp, after a bench trial. On cross-appeal, plaintiffs argue that the trial court erred when it determined that Quantum and its owner/operator, defendant John Trimberger, were not liable for negligence. They also argue that the trial court erred when it halved their award of attorney fees without a sufficient basis for doing so. We affirm in the main appeal. In the cross-appeal, we affirm the trial court's holding of no cause of action for plaintiffs' negligence claim, but vacate the award of attorney fees and remand for reconsideration of plaintiffs' motion for attorney fees.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiffs own property in Kalamazoo on which there sits an outbuilding. The outbuilding is about 13,500 square feet in size and has three areas: a large pole barn area for vehicle storage; a wash bay (for washing vehicles) that is about 1,300 to 1,500 square feet in size; and a temperature-

-1-

and humidity-controlled machine shop that is 3,500 to 3,700 square feet in size. Quantum is a limited liability company that sells and applies floor coatings for garages and commercial buildings.[1]

In March 2021, Jerry contacted Trimberger. He wanted Trimberger to redo the floor of his attached garage and to coat, in a monolithic single color, 5,000 square feet of the outbuilding floor that included the wash bay and machine shop.

Jerry told Trimberger that he wanted a chip coat in the garage and two coats of polyaspartic coating in the machine shop and wash bay. Jerry testified that he told Trimberger that he wanted the floor in the outbuilding to be monolithic and smooth and glass-like, similar to the floor of an airport hangar. Jerry stated that he emphasized that the joints between the concrete slabs in the machine shop and wash bay had to be filled, especially in the wash bay. According to Jerry, Trimberger objected, voicing a concern that, because the machine shop was so large, he would not be able to maintain a wet edge during the application of the coating. Trimberger told Jerry that the polyaspartic coating would dry too fast and he would see lines. Jerry testified that he and Trimberger then talked about filling the joints after the application with a silicone-like solution; Jerry agreed to that suggested process for the machine shop.

Trimberger submitted an estimate to Jerry, which was dated March 12, 2021. The estimate stated that it included two coats of light gray polyaspartic coating and joint filler for the wash bay. The estimate for the portion of the project that included the machine room and wash bay was $18,139.80.

Quantum began working on the project in April 2021. Quantum hired a subcontractor, Concrete Preparation Services (CPS), to prepare the floor by "shotblasting" it. Shotblasting is a method of preparing concrete flooring for coating that uses a machine to shoot small metal balls into the concrete, which are later vacuumed up. CPS performed a shotblast, but Trimberger was unhappy with the first course of shotblasting and instructed CPS to shotblast it again.

Jerry stated that he checked on CPS's progress when it was about 95% finished with the second shotblast. He was mortified by the amount of chipping that had occurred with the second shotblast. He testified that the joints were also "blown out," and there was no longer a nice edge for any sealant. Jerry testified that, after viewing the floor, he reminded Trimberger that the floor was supposed to be monolithic and smooth, and requested that any pits, holes, and edges be filled. Jerry stated that Trimberger told him that Quantum would fill any holes larger than a nickel and assured him that the polyaspartic coating would cover any smaller holes and the edges. Trimberger told Jerry not to fill the joints before the application of the coating. Trimberger also said that if Jerry would just let Trimberger get the coating down, then Jerry would be happy with the results. Jerry testified that he accepted Trimberger's assurances and agreed to proceed with the coating despite his reservations.

---

[1] The name of Trimberger's company originally was "Slide-Lok of Grand Rapids LLC," but Trimberger changed the entity's name to Quantum.

Quantum finished the coating on May 4, 2021. Jerry was very unhappy with the results. He stated that the polyaspartic coating did not cover the defects. There were visible holes all over the floor and highly visible blown edges. Jerry testified that there were about a thousand visible holes in each 12-by-12-foot section of the floor. There were also parts where the coating was so thin that one could see the concrete underneath, and there was foreign material lodged in the coating.

Jerry testified that Quantum billed him for the work on May 5, 2021. The bill included $1,150 in costs to repair the damage done by the shotblasting. Jerry responded to the e-mail and objected to these additional charges. Jerry told Trimberger that he was disappointed in the cleanup and filler charges, and opined that the cleanup should have been included in the original price of the job. Jerry also wrote that he thought that filling holes caused by shotblasting was just part of the normal process for applying polyaspartic. Trimberger wrote back that it was not normal practice to fill small holes caused by shotblasting. Jerry testified that Trimberger did not offer to come back and do anything to fix the issues with the floor.

In July 2021, Quantum placed a lien on plaintiffs' property for $19,401.33, the amount invoiced on May 5, 2021. Plaintiffs sued Quantum and Trimberger in August 2021, asserting a claim for breach of contract against Quantum, a quiet-title claim to remove the construction lien that Quantum had placed on the property, a claim for slander of title against Quantum, a negligence claim against Quantum and Trimberger, and a fraud claim against Quantum and Trimberger arising from their use of the name Slide-Lok of Grand Rapids.

Quantum and Trimberger countersued in September 2021, alleging that plaintiffs had breached the contract for installation of a polyaspartic coating on the floor of the outbuilding by failing to pay for the work. They also sought to foreclose on Quantum's lien.

Defendants moved for summary disposition. After a hearing, the trial court granted their motion with respect to plaintiffs' fraud claim, but denied it regarding the remaining claims. After the trial court dismissed the plaintiffs' fraud claim, the remaining claims and counterclaims proceeded to a bench trial.

At trial, plaintiffs presented evidence that Jerry had requested a smooth coating for the floor of the machine shop and wash bay. They also presented evidence supporting their claim that Trimberger's decision to order a second round of shotblasting was negligent and had caused excessive damage to the floor. They also showed that Quantum failed to adequately prepare the floor before applying the polyaspartic floor coating. Finally, they presented evidence that the only way to rectify Quantum's poor workmanship was to completely grind off the polyaspartic coatings that Quantum had put down, repair the damaged floor, and apply an entirely new coating.

Trimberger testified that Quantum always applies polyaspartic coating with an "orange peel" texture finish and that he would not have agreed to a smooth finish. Trimberger also testified that the second round of shotblasting was necessary to prepare the floor, and further testified that Jerry had insisted that Quantum not fill the joints at issue. Defendants argued that the evidence showed that plaintiffs had received precisely what they had asked for and yet had wrongfully refused to pay for the service.

The trial court issued its decision, which it referred to as a final order, in October 2022. The trial court determined that, because the parties had contemplated that the contract would include preparation work, plaintiffs had no cause of action for negligence against Trimberger or Quantum. The trial court held that the plaintiffs had prevailed on their quiet-title and slander-of-title claims, explaining that it was clear from the record that the parties had a dispute as to Quantum's performance under the contract. For that reason, Quantum had no basis for imposing a lien and the lien was invalid. The court, however, found that the plaintiffs had not suffered any damages as a result of the improper lien.

Regarding plaintiffs' contractual claims, the trial court found that the parties' contract did not explicitly include the type of finish for the sealed floor; it only included applying a particular type of sealant. The trial court found that plaintiffs had established that Quantum breached the contract by failing to remedy the effects of the shotblasting process and failing to provide the properly-applied sealed surface that it had contracted to provide. The trial court found that plaintiffs had incurred $34,745.67 in damages. Specifically, it found that they had to pay $25,251 to restore the floor to its original condition and then had to pay $9,494.67 over the originally agreed-upon price to get the floor for which they had bargained.

After the trial court's decision, plaintiffs moved for an award of attorney fees, in relevant part, under MCL 570.1118. The original trial judge, Judge Alexander Lipsey, agreed that the plaintiffs were entitled to their attorney fees under that statute, but he reserved his ruling on the issue of reasonableness to allow defendants to file formal objections. Judge Curtis Bell succeeded Judge Lipsey after Judge Lipsey's retirement, and subsequently determined that plaintiffs were entitled to half the fees that they had originally requested.

This appeal and cross-appeal followed.

## II. BREACH OF CONTRACT

Quantum argues that the trial court misapplied the law and made inadequate findings when making its decision on the competing breach-of-contract claims. It argues that these errors warrant a new trial. We disagree.

## A. STANDARD OF REVIEW

This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules. *Franks v Franks*, 330 Mich App 69, 86; 944 NW2d 388 (2019). This Court also reviews de novo whether the trial court properly interpreted and applied the common law. See *Redmond v Heller*, 332 Mich App 415, 438; 957 NW2d 357 (2020). This Court reviews a trial court's findings of fact after a bench trial for clear error. *Chelsea Inv Group, LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). A trial court's findings are clearly erroneous when there is no evidentiary support for the finding or when this Court is left with a definite and firm conviction that the trial court made a mistake. *Id*. This Court defers to the trial court's superior ability to judge the credibility of witnesses before it. *Id*.

-4-

B. ANALYSIS

Quantum argues that the trial court's findings of fact were inadequate and clearly erroneous in various respects. We disagree. When making its decision after a bench trial, the trial court had to "find the facts specially, state separately its conclusions of law, and direct entry of the appropriate judgment." MCR 2.517(A)(1). It did not, however, have to exhaustively survey all the evidence or discuss every application of law; it only had to make "[b]rief, definite, and pertinent findings and conclusions on the contested matters." MCR 2.517(A)(2). A trial court's findings and conclusions satisfy MCR 2.517(A)(2) if it is manifest to this Court that the trial court was aware of the factual issues, correctly applied the law to the facts, and this Court does not need further explication to facilitate appellate review. See *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 176-177; 530 NW2d 772 (1995).

In order to establish their breach-of-contract claims, both parties had to establish that there was a contract, that the other party breached it, and that the breach caused them damages. See *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 100; 878 NW2d 816 (2016). In its final order, the trial court noted that the parties disputed who had first breached the agreement. The trial court also found that the parties did not have a meeting of the minds regarding whether the floor would ultimately have a smooth or "orange peel" texture. However, the trial court found that the parties had come to an agreement on the sealant material, the cost of the project, and the dates of service. The trial court further found that there was significant evidence that Quantum's work product was substandard and "required extensive remediation to deal with the surface created by the shot blasting process." It also found that adding an additional coat of polyaspartic coating would not resolve those underlying issues, and that the only way to address the issues in the floor was to strip the current coating off the floor and begin again. On the basis of these findings, the trial court held that Quantum had breached the contract and should be held liable for the costs necessary to get the floor into the condition agreed to by the parties.

The record supports the trial court's factual findings and holdings. Quantum agreed to apply two coats of a polyaspartic coating on about 5,000 square feet of flooring in two areas, and plaintiffs agreed to pay Quantum a fixed sum for the work. It is an implied term of every contract of this nature that the party performing the work will do so "in a diligent and reasonably skillful workmanlike manner." *Nash v Sears, Roebuck & Co*, 383 Mich 136, 142; 174 NW2d 818 (1970). Accordingly, Quantum had the obligation to perform the coating in a diligent and reasonably skillful manner and then turn over the completed floor to plaintiffs before plaintiffs were required to pay for the service; in other words, Quantum's performance was a condition precedent to plaintiffs' obligation to pay. See *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 411-412; 646 NW2d 170 (2002) (defining condition precedent as a condition that must be met by one party before the other party has a duty to perform).

The trial court recognized that the dispute centered on which party breached first, and it plainly found that Quantum was the first to breach. Generally, if a party first commits a substantial breach of the contract, then that party cannot maintain a breach-of-contract claim against the other party for a subsequent failure to perform under the contract. See *McCarty v Mercury Metalcraft Co*, 372 Mich 567, 573; 127 NW2d 340 (1964); See also *Omnicom of Mich v Giannetti Investment Co*, 221 Mich App 341, 348; 561 NW2d 138 (1997) (stating that the breach must be material in order to relive the other party of performance).

-5-

In making its finding that Quantum breached the contract first, the trial court clarified that the issue was not with the final finish or the number of coatings applied to the floor. Rather, the trial court cited the testimony of multiple witnesses, including experts, that Quantum's preparatory work had damaged the floor and was not rectified before making the application. The trial court clearly found this testimony credible and determined that Quantum had breached the contract, even though it applied the two coats of polyaspartic coating specified by the agreement, by failing to adequately prepare the floor before application. Moreover, it is also evident that the trial court found that Quantum's breach was material and, for that reason, excused plaintiffs' obligation to pay under the agreement. See *Omnicom of Mich*, 221 Mich App at 348. On this record, the trial court's findings of fact and conclusions of law met the requirements of MCR 2.517(A)(2). See *Triple E Produce Corp*, 209 Mich App at 176-177.

Quantum also argues that the trial court erred by failing analyze and apply the law applicable to rescission when rendering its decision. We disagree. Rescission is distinct from enforcement of a contract or seeking damages for its breach. See *Wall v Zynda*, 283 Mich 260, 264-265; 278 NW 66 (1938) (stating that rescission seeks to undo a contract and to restore the parties to their condition before entering into the agreement; it does not seek to enforce it by way of recovery for damages from a breach). The record in this case shows that both parties sought to receive the benefit of their bargain under the contract, not rescind it. Because rescission is distinguished from breach of contract, and neither party sought to rescind the contract, the trial court had no basis for discussing the law of rescission. See *Flamm v Scherer*, 40 Mich App 1, 8-9; 198 NW2d 702 (1972) (stating that the case did not involve rescission, it involved a material breach of contract that excused the other party's subsequent failure to perform).

Quantum further argues that the trial court clearly erred when it found that Quantum had applied extra coatings in an effort to solve the problem with the floor. In its findings of fact, the trial court noted that the evidence showed that the concrete floor had to be prepared by abrading it in order to ensure that the polyaspartic coating would adhere to the surface. The trial court was aware that the evidence further showed that Quantum hired a subcontractor to abrade the floor with shotblasting and that the subcontractor performed a round of shotblasting, but that Trimberger was unhappy with the result and ordered a second round of shotblasting, contrary to the subcontractor's recommendation. In light of this evidence, the trial court stated:

> Unfortunately, the second treatment resulted in substantial damage to the concrete. The Defendants attempted to resolve this with extra coatings of polyaspartic. The result was unsatisfactory to Mr. Culp and the matter ultimately resulted in this litigation.

The trial court's statement can be interpreted in different ways. There was evidence that Trimberger thought the floor looked pretty good after two coats of polyaspartic coating, and had suggested the application of a third coat of polyaspartic as a possible remedy to Jerry's concerns with the floor's final appearance. No additional coats were applied to the floor, as plaintiffs believed that additional coats, without correcting the damage caused by the preparatory work, would not solve the issue. Given this evidence, the trial court's statement might plausibly refer to the discussion between Jerry and Trimberger concerning a third coat. As such, it is not clear that this statement by the trial court was a factual finding that Quantum actually applied additional

coatings beyond the two that it did. Such a finding would have been clearly erroneous. See *Chelsea Inv Group*, 288 Mich App at 250. However, even if the trial court did make an erroneous finding of fact concerning extra coats, the error was not cause for reversal. The trial court specifically found that extra coatings would not solve the problems caused by the damage to the floor. Rather, the damage to the floor had to be corrected before any application. Trial testimony and evidence amply supported that finding. Accordingly, even if the trial court's finding on the additional coats amounted to clear error, that error would not warrant a new trial. See MCR 2.613(A).

Quantum, relying on the law of foreign jurisdictions, also argues that Michigan law should impose a duty on the party hiring a contractor to inform the contractor of any perceived defects in the contractor's work and to give the contractor an opportunity to cure the defect before asserting a breach and seeking to rectify the defect by hiring a different contractor. We see no need to adopt a new rule of law on this subject.

Quantum relies heavily on the decision in *McClain v Kimbrough Constr Co, Inc*, 806 SW2d 194 (Tenn App, 1990). In that case, a general contractor hired a subcontractor to perform brick work. The general contractor was unhappy with the brick work and unilaterally terminated the contract with the bricklayer. See *id*. at 196-197. The court noted that Tennessee courts have imposed a duty in every contract between a general contractor and a subcontractor, even in the absence of an explicit clause, to provide a subcontractor with notice and an opportunity to cure before terminating a contract. *Id*. at 198, citing *Cortolano & Barone, Inc v Morano Constr Corp*, 724 F Supp 88, 98 (SD NY, 1989), and *Cyclo Floor Machine Corp v Nat'l Housewares, Inc*, 296 F Supp 665, 682 (D Utah, 1968).

Although foreign court and federal court decisions may be persuasive, see *Hiner v Mojica*, 271 Mich App 604, 612; 722 NW2d 914 (2006); *Omian v Chrysler Group LLC*, 309 Mich App 297, 307 n 6; 869 NW2d 625 (2015), we do not find the decision in *McClain*, which relied on federal court decisions, particularly persuasive. Our Supreme Court has already explained whether, and how, the duty to provide notice and an opportunity to cure applies in the context of a decision by one party not to perform. In *Walker & Co*, our Supreme Court addressed a case wherein the lessee of a sign canceled the lease after the lessor was unresponsive to requests to come and service the sign. The lease agreement provided that the lessor would maintain and service the sign during the term of the lease. After someone hit the sign with a tomato, the lessee insisted that the lessor service the sign and clean the tomato stain, as well as remedy some rust and writings. The lessor did not respond and the lessee terminated the lease. See *Walker & Co*, 347 Mich at 632-633.

On appeal, our Supreme Court addressed the lessee's claim that the lessor had committed a material breach, which justified the lessee's decision to terminate the contract. Our Supreme Court agreed that a material breach would justify a unilateral decision to terminate, but it warned about the consequences of making such a decision when the facts do not justify it:

> Defendants urge upon us again and again, in various forms, the proposition that Walker's failure to service the sign, in response to repeated requests, constituted a material breach of the contract and justified repudiation by them. Their legal proposition is undoubtedly correct. Repudiation is one of the weapons

available to an injured party in event the other contractor has committed a material breach. But the injured party's determination that there has been a material breach, justifying his own repudiation, is fraught with peril, for should such determination, as viewed by a later court in the calm of its contemplation, be unwarranted, the repudiator himself will have been guilty of material breach and himself have become the aggressor, not an innocent victim. [*Id*. at 634-635.]

Our Supreme Court then went on to examine whether the breach at issue was in fact material, stating in relevant part:

What is our criterion for determining whether or not a breach of contract is so fatal to the undertaking of the parties that it is to be classed as "material"? There is no single touchstone. Many factors are involved. They are well stated in 1 Restatement, Contracts, § 275, in the following terms:

"In determining the materiality of a failure fully to perform a promise the following circumstances are influential:

"(a) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

"(b) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;

"(c) The extent to which the party failing to perform has already partly performed or made preparations for performance;

"(d) The greater or less hardship on the party failing to perform in terminating the contract;

"(e) The willful, negligent or innocent behavior of the party failing to perform;

"(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract." [*Id*. at 635.]

Notably, our Supreme Court did not hold that a party cannot unilaterally terminate a contract on the basis of a perceived breach of the contract without first giving the opposing party notice and an opportunity to cure; rather, it warned that a unilateral decision of that nature might expose the terminating party to damages if a court later determined that the claimed breach did not warrant termination. See *id*. at 635.

Evidence that the breaching party would have been willing and able to cure his or her breach weighs against a finding that a breach was material. See Restatement Contracts, 2d, § 241. Nevertheless, under Michigan law, a party is not precluded from terminating a contract on the perceived basis that the other party breached it materially without first providing notice and an opportunity to cure. Rather, that failure to offer an opportunity to cure would be a factor to

-8-

consider when determining whether there was a material breach. See *Walker & Co*, 347 Mich at 634-636.

Quantum also argues that the trial court should have performed a detailed recitation of the factors stated under *Walker & Co*, as restated in *Omnicom*, 221 Mich App at 348, in its findings of fact. It argues that when the factors are properly applied, the trial court should have found that Quantum did not materially breach the contract. Although the trial court did not explicitly refer to each of these factors, the trial court's findings were sufficient to permit appellate review, and were supported by the evidence. See *Triple E Produce Corp*, 209 Mich App at 176-177.

Quantum argues that the evidence showed that the extra damage caused by the second course of shotblasting was unexpected and that Jerry prevented Quantum from filling the joints. We disagree with that interpretation of the evidence. There was evidence that the subcontractor who performed the shotblasting specifically told Trimberger that the first course of shotblasting was adequate for a polyaspartic coating and that a second course of shotblasting was unnecessary. Despite that, Trimberger ordered the subcontractor to proceed with a second course. There was also expert testimony that industry standards required a contractor who was applying a polyaspartic floor system to fill joints, holes, and divots in the floor and ensure that all the shotblast was cleared and that the floor was free from debris before applying the polyaspartic coat. Indeed, the expert testified that properly preparing the floor was the most important aspect of installing a polyaspartic system.

Although Trimberger testified that Jerry had insisted that Quantum leave the joints in the larger room unfilled, the evidence at trial permitted the inference that Trimberger was the driving force behind that decision. Jerry testified that he wanted all the joints filled, but that Trimberger did not want to fill the joints because he felt that having the joints unfilled would allow him to maintain a wet edge during the application of the coating. Expert testimony established that a contractor would only have to worry about a wet edge if he did not have a sufficiently large crew to apply the coating before it set. The expert opined that one would need a crew of 8 to 10 persons to apply a polyaspartic coating to a floor the size of the floor in the machine shop, yet there was evidence that Trimberger used a crew of only 3 men. Plaintiffs also admitted into evidence an e-mail, sent the day before Trimberger applied the polyaspartic coating, in which Jerry had expressed concern to Trimberger about the decision to proceed without filing the joints in that room. The totality of the evidence strongly supported a finding that Jerry wanted all the joints to be filled. On that basis, the trial court could conclude that Trimberger had misrepresented events to minimize his role in the poor outcome caused by the failure to fill the joints.

The evidence showed that Trimberger failed to adequately prepare the floor before applying the polyaspartic treatment and that his failure led to an unacceptable floor surface. The evidence established that Quantum's failure to prepare the floor deprived plaintiffs of the substantial benefit of their contract by delivering a floor in unacceptable condition, and was a material breach of that contract. See *Walker & Co*, 347 Mich at 635; Restatement Contracts, 2d, § 241(a).

There was also evidence that Jerry informed Trimberger of his concerns immediately after the second application and questioned whether there was anything that Trimberger could do to correct the problems. Specifically, while looking at the floor with Trimberger after the second

coating, Jerry told Trimberger, "If you had a magic wand in your back pocket that could make this smooth and flat, I would write you a check for $10,000 right now." After that remark, he asked Trimberger, "[I]f we put down a third coat, what impact do you think that will make[?]" He testified that Trimberger responded that he did not think it would help. According to Jerry, Trimberger wanted to leave because he had another job the following day, and Jerry acquiesced and told him to go. Trimberger billed plaintiffs the next day for the completed work. The evidence further showed that Jerry continued to express discontent to Trimberger and ultimately informed him that he would not be paying for the substandard work within a few weeks after Trimberger billed him.

The evidence showed that Trimberger felt that the floor was good enough and that Jerry's complaints were unwarranted. The evidence even showed that Trimberger billed Jerry for filling the holes that he caused in the floor—to the extent that he filled any—as extra work beyond that contemplated under the agreement, despite the expert testimony that such filling is a standard and essential part of any preparation to install a polyaspartic floor system. The evidence supports a finding that Quantum was on notice that Jerry did not accept Quantum's performance and that Quantum, through Trimberger, disagreed that any additional work on the floor was necessary. The trial court could conclude from the evidence that Quantum's failure to remedy the floor's condition was willful and that it had no intention of taking any further steps to correct the issue. These factors also weighed in favor of finding that the breach was material. See *Walker & Co*, 347 Mich at 635; Restatement Contracts, 2d, § 241(d), (e).

In sum, the evidence at trial permitted the inference that plaintiffs relied on Trimberger's expertise and that Trimberger at all times controlled the circumstances leading to the poor workmanship at issue; that Trimberger told the subcontractor to perform a second shotblast; that Trimberger chose not to take extra steps to ensure that the floor was free from debris; that Trimberger chose not to fill the joints because he knew his crew was too small for the job; that Trimberger chose not to take the steps to correct the damage caused by the second round of shotblasting; and that, ultimately, Trimberger elected to apply two coats of polyaspartic coating on the improperly prepared floor despite the fact that nothing could be done to cure the defects after the polyaspartic cured without removing the coatings that he had applied. Under these circumstances, the evidence strongly supported the trial court's finding that Quantum—acting through Trimberger—materially breached the contract when he chose to apply the coatings without adequately preparing the floor. See *Walker & Co*, 347 Mich at 635; Restatement Contracts, 2d, § 241. For that reason, plaintiffs were excused from paying for the floor and could sue to get the benefit of their bargain. See *McCarty*, 372 Mich at 573.

Quantum also argues that, because the trial court found that the parties had not agreed on whether the final finish of the floor would be smooth or "orange peel," it should not have awarded damages to plaintiffs based on their dissatisfaction with the floor. We disagree. The record clearly shows that there were numerous issues with the floor beyond merely having a final finish that was different than what the plaintiffs had envisioned, as discussed. Plaintiffs did not merely receive a floor coating that was different than what they had envisioned—rather, the record shows that they received a floor with significant faults that required a complete removal of Quantum's coatings, re-preparation of the floor surface, and re-coating of the floor in order to achieve the result for which plaintiffs had originally bargained. The trial court did not err by awarding plaintiffs

-10-

damages, notwithstanding the lack of agreement over the floor's final finish. See *Kamalnath*, 194 Mich App at 548.

The trial court also did not clearly err by awarding damages that included the price of a replacement floor coating when plaintiffs ultimately elected to use a different floor coating system after remediating the damage caused by Quantum. Plaintiffs presented evidence at trial that their new contractor applied a different floor system that was comparable to polyaspartic floor systems, but cost less. Plaintiffs had a duty to make every reasonable effort to mitigate the damages from Quantum's breach of contract. See *J Marshall Robins Enterprises, Inc v Ewald Steel Co*, 52 Mich App 599, 602; 218 NW2d 125 (1974). There was nothing improper in their decision to reduce the overall cost of rectifying the improperly installed polyaspartic system by replacing it with a less expensive system.

Quantum has not demonstrated that the trial court erred by holding that Quantum had breached its contract with plaintiffs and awarding damages for that breach.

## III. ATTORNEY FEES

Both parties challenge the trial court's decision awarding attorney fees. Quantum argues that the trial court erred by awarding attorney fees to plaintiffs without finding that Quantum's foreclosure attempt was vexatious. On cross-appeal, plaintiffs argue that the trial court abused its discretion when it halved the award without an adequate rationale for doing so. We agree with both arguments.

### A. STANDARD OF REVIEW

This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules. *Franks*, 330 Mich App at 86. For an action brought under the Construction Lien Act (CLA), MCL 570.1101 *et seq*., the Legislature gives trial courts the discretion in certain circumstances to award attorney fees, MCL 570.1118(2). See *Ronnisch Constr Group, Inc v Lofts on the Nine, LLC*, 499 Mich 544, 567 n 73; 886 NW2d 113 (2016). This Court reviews a trial court's decision to award attorney fees under the CLA for an abuse of discretion, but it reviews the trial court's findings of fact underlying its decision for clear error. *CD Barnes Assoc, Inc v Star Heaven, LLC*, 300 Mich App 389, 425; 834 NW2d 878 (2013). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. See *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). A trial court's finding is clearly erroneous when, after reviewing the entire record, this Court is left with the definite and firm conviction that the trial court made a mistake. *CD Barnes Assoc*, 300 Mich App at 425.

### B. VEXATIOUS ACTION

The CLA gives a trial court the discretion to "allow reasonable attorneys' fees to a lien claimant who is the prevailing party" in an action to enforce a construction lien through foreclosure. MCL 570.1118(2). The CLA also grants courts the discretion to award attorney fees to a "prevailing defendant" in an action to enforce a construction lien through foreclosure, but only if the court first "determines the lien claimant's action to enforce a construction lien under this section was vexatious." MCL 570.1118(2). An action is vexatious when it is undertaken with no

reasonable belief that it was meritorious. *E R Zeiler Excavating, Inc v Valenti Trobec Chandler, Inc*, 270 Mich App 639, 652; 717 NW2d 370 (2006).

In its final order, the trial court found in favor of plaintiffs on their quiet-title and slander-of-title actions. The trial court found that the record "clearly established that Plaintiffs and Defendants had a dispute as to Defendants' performance under the contract." On that basis, it found that "any basis for imposing a lien on the property [was] without support, and therefore, the lien should be considered invalid."

Plaintiffs moved for an award of attorney fees in part under MCL 570.1118(2) because Quantum had sought to foreclose its construction lien along with its breach-of-contract claim and did not prevail. Quantum argued in response that the trial court never made a finding that the lien claim was vexatious in its final order. It also suggested that it was goaded into filing the lien by plaintiffs' attorney, and argued that the record did not support a finding that its foreclosure claim was vexatious.

Judge Lipsey presided over the hearing on the motion for attorney fees. After hearing the parties' arguments, Judge Lipsey did not make any findings in support of his decision to award plaintiffs their attorney fees. Rather, he stated that he believed that the "imposition of the attorney fees [was] appropriate under the statute." For that reason, he stated that the only remaining issues was the reasonableness of the fees. Judge Bell later deferred to Judge Lipsey's decision to award the fees and limited his decision to addressing the reasonableness of the award.

The trial court never explicitly stated that Quantum's foreclosure claim was vexatious; further, to the extent that the court impliedly found that Quantum's claim was vexatious, the trial court's explanation for its decision was insufficient for appellate review of its findings. See *Triple E Produce Corp*, 209 Mich App at 176-177. The trial court did not provide any reasons that would support such a finding.

Plaintiffs argue that this Court's decision in *Sullivan v The Thomas Org, PC*, 88 Mich App 77; 276 NW2d 522 (1979), indicates that if a contractor defaults on a contact, then the contractor has no right to a lien, so an attempt to foreclose a lien is necessarily vexatious. They further argue that Quantum knew that it had no right to payment under the contract when it sought to enforce its lien, and only did so for vexatious reasons.

*Sullivan* does not support plaintiffs' argument that a contractor's attempt to enforce an invalid lien is necessarily vexatious. In *Sullivan*, this Court concluded that filing an invalid lien can constitute a falsehood sufficient to support a slander of title claim. *Id*. at 83. However, this Court did not hold that filing or attempting to enforce a lien that was later determined to be invalid necessarily amounts to a vexatious proceeding. Indeed, this Court went on to state that merely filing an invalid lien was not evidence of malice: "Malice may not be inferred simply from the filing of an invalid lien; plaintiffs must show that defendants knowingly filed an invalid lien with the intent to cause plaintiffs injury." *Id*. at 86. The Court held that the facts concerning the decision to file an invalid lien can constitute circumstantial evidence of ill will. *Id*.

In this case, there was little evidence concerning Quantum's decision to file its lien, and the trial court did not make specific findings concerning the issue. Accordingly, we conclude that

trial court's findings and rationale were insufficient for appellate review of this claim of error, and remand for reconsideration of plaintiffs' motion for attorney fees under the CLA. See *Triple E Produce Corp*, 209 Mich App at 176-177.

## C. FEE REDUCTION

On cross-appeal, plaintiffs argue that the trial court abused its discretion when it halved their fee award. We agree.

Generally, when a statute authorizes an award of reasonable attorney fees, courts should apply the framework stated in *Pirgu v United Servs Auto Ass'n*, 499 Mich 269; 884 NW2d 257 (2016), and *Smith v Khouri*, 481 Mich App 519; 751 NW2d 472 (2008), to determine the fee. See *Burton v Michigan*, 340 Mich App 633, 645-646; 987 NW2d 879 (2022) (stating that the *Pirgu* framework applies when the Legislature has authorized only a reasonable fee). In order to facilitate appellate review, a trial court should briefly discuss its view of the various factors that it must consider when determining whether an award is reasonable. See *Pirgu*, 499 Mich at 282. A trial court abuses its discretion when it does not follow the framework stated in *Pirgu* when required to do so. See *Burton*, 340 Mich App at 650.

In this case, Judge Lipsey determined that an award of attorney fees was appropriate, and later Judge Bell considered Quantum's challenge to the reasonableness of the amount requested. The trial court did not, however, apply the framework from *Pirgu*. The court decided that it would be reasonable to halve the total requested fees for the following reasons:

> Ultimately, it really comes down to the reasonableness of the fees for the two day trial and the amount of money that was at issue here and the attorneys fees that were ultimately derived and that were charged in this matter.

> And again, that could relate to the unreasonableness of the parties and their posturing, but ultimately I do find that a reduction is in order based on the reasonableness, and this is within the Court's discretion.

> And based on the fact that one of the parties was no caused and that there were other pieces of this as I have already described that were could have been dealt with differently. The Court will reduce the attorney fees by 50 percent and that will be the Court's decision. And that will be included in the amended order and final judgment.

The trial court thus apparently halved the total fee award, at least in part, on the basis of the plaintiffs' failure to establish that Trimberger was personally liable for any damages through his own negligence. The court did not, however, explain how Trimberger's lack of liability justified such a significant reduction in the award. It did not, for example, reduce the award by denying billing by plaintiffs' lawyer for time spent working on the negligence claim against Trimberger as distinct from other claims. The trial court also cited discovery issues as an alternate ground in support of the reduction, but it did not identify the specific discovery disputes that supported the reduction of the award, and did not adjust the award by removing the hours spent on those disputed matters. On this record, the trial court's rationale was inadequate to permit

-13-

meaningful appellate review of the attorney fee award. See *Pirgu*, 499 Mich at 282; *Triple E Produce Corp*, 209 Mich App at 176-177. Additionally, the trial court abused its discretion by failing to apply the framework discussed in *Pirgu* to its calculation of a reasonable fee. See *Burton*, 340 Mich App at 650. On remand, the trial court should apply the appropriate framework when analyzing the reasonableness of any award of attorney fees, so as to permit appellate review of that award.

## IV. NEGLIGENCE

On cross-appeal, plaintiffs argue that the trial court erred when it determined that defendants could not be held liable for the damage to the floor under a negligence theory.[2] We disagree.

## A. STANDARD OF REVIEW

This Court reviews de novo whether the trial court properly interpreted and applied this state's common law. See *Redmond*, 332 Mich App at 438. This Court reviews for clear error a trial court's findings of fact after a bench trial. *Chelsea Inv Group*, 288 Mich App at 250.

## B. ANALYSIS

To establish a claim for negligence, a plaintiff must show that "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." See *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 169-171; 809 NW2d 553 (2011). While the determination that a duty of care exists is generally a question of law, whether or not a party breached that duty of care is generally a question of fact. See *Kandil-Elsayed v F&E Oil, Inc*, 512 Mich 95, 112; 1 NW3d 44 (2023).

In Michigan, courts generally respect the separate identity of a corporate entity from its owners and agents. See *Green v Ziegelman*, 310 Mich App 436, 450-451; 873 NW2d 794 (2015). Additionally, an agent is generally not personally liable to a third party for the breach of a duty owed by his or her principal to that party, even if that breach of duty was the result of the agent's acts or omissions. See *Bailey v Schaaf (On Remand)*, 304 Mich App 324, 348-350; 852 NW2d 180 (2014), vacated in part on other grounds 497 Mich 927 (2014). Rather, an agent is only personally liable for the breach of a duty that the agent independently owed to the injured person, separate and distinct from the agent's contractual obligations to the principal. See *id*. at 350; see also *Fultz v Union-Commerce Associates*, 470 Mich 460, 467; 683 NW2d 587 (2004).

A defendant's duty may arise out of a contractual relationship. See *Fultz*, 470 Mich at 465. However, to support a claim for negligence, separate from a breach of contract, a noncontracting

---

[2] Plaintiffs acknowledge that the damages they seek under a negligence theory are subsumed within the damages they were awarded under a breach of contract theory, which award we are affirming on appeal. Plaintiffs also acknowledge that their claim for damages against Trimberger individually is intended to afford them an alternative avenue of recovery.

plaintiff may establish that a defendant owed them a legal duty that "arises separately and distinctly from the contractual agreement" and breached that duty with a "wrong independent of a contract." *Loweke*, 489 Mich at 169, 171. A contractual relationship does not alter the general common-law duty of care "owed to noncontracting third parties in the performance of a contract." *Id.* at 172.

Plaintiffs argue that Quantum and/or Trimberger negligently ordered the second round of shotblasting, which caused damage to the floor. The trial court held that this conduct was contemplated by the contract and plaintiffs' claim sounded in contract, not tort. We agree. First, plaintiffs are not noncontracting third parties to whom an independent duty might be owed. *Id*. Moreover, the record shows that the parties agreed to the shotblasting process, which "damages" the floor in a sense, as part of the preparation work prior to the application of the polyaspartic coating. There was testimony from multiple witnesses and experts that the repair of damage caused by the abrasion process was a vital part of the preparation work; indeed, plaintiff's own expert testified that if the shotblasting process was "done too heavy," there were numerous ways a contractor could still render the floor ready for coating, including self-leveling patches or re-abrading the entire surface. The expert also testified that Quantum's workers failed to properly remove debris from the floor before coating it, failed to fill the joints in the floor, and failed to properly repair "bubble holes" in the concrete before applying the coating. All of this conduct arose from Quantum's contractual duty to prepare and coat the floor, and Quantum's failure to deliver a properly prepared and coated floor was properly deemed by the trial court to be a contractual, rather than tort, claim. *Loweke*, 489 Mich at 171.

Regarding Trimberger, and regardless of whether he was directing Quantum's actions or acting as an employee or agent of Quantum when ordering the shotblasting, plaintiffs have not shown that Trimberger breached an independent duty that he owed to plaintiffs outside of Quantum's contractual obligation to prepare and coat the floor. It is clear here that the harm alleged by plaintiffs was the failure to properly prepare the floor for coating; any "damage" from the second round of shotblasting could have been repaired as part of the preparation process, had Quantum not failed to uphold its contractual obligation. The trial court did not err by finding that plaintiffs had not established a claim for negligence against either defendant. *Chelsea Inv Group*, 288 Mich App at 250.

## V. CONCLUSION

We affirm the trial court's judgment, but vacate the trial court's award of attorney fees and remand to the trial court for reconsideration of plaintiffs' motion for attorney fees, including whether plaintiffs are entitled to attorney fees under the CLA and, if so, the reasonableness of the fees claimed.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this

opinion. We do not retain jurisdiction. None of the parties having prevailed in full, none may tax costs. See MCR 7.219(A).

/s/ Mark T. Boonstra
/s/ Christopher M. Murray
/s/ Thomas C. Cameron